## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ICON EV LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection, <br><br> *Defendants.* | Court No. 26-02759 |

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER <u>AND PRELIMINARY INJUNCTION</u>

Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-01609
lmathers@strtrade.com

Dated: April 13, 2026

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................... 2

    I.    ICON's Electric Golf Carts are Manufactured in Vietnam using Vietnamese Frames and Other Significant Vietnamese Inputs ........................................................................... 2

    II.    Without Any Notice or Opportunity to be Heard—and Without Actually Determining that ICON's Merchandise is Subject to the Antidumping and Countervailing Duty Orders Covering Chinese Electric Golf Carts—Customs Imposes Interim Measures Amounting to Sanctions ... 4

SUMMARY OF ARGUMENT ........................................................................................ 9

ARGUMENT ................................................................................................................... 10

    I.    Standard of Review ................................................................................................ 10

    II.    ICON is Likely to Succeed on the Merits Because Customs Failed to Provide ICON Predeprivation Notice or a Meaningful Opportunity to be Heard, in Violation of the Fifth Amendment ................................................................................................................. 10

    III.    This Court has Jurisdiction to Remedy Customs' Unconstitutionally Imposed Interim Measures Now ............................................................................................................... 14

    IV.    ICON Will be Irreparably Harmed Absent Injunctive Relief ....................................... 18

    V.    The Balance of the Equities and Public Interest Favor ICON ......................................... 21

CONCLUSION ................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)............................................................................................. 16

*Air Brake Systems, Inc. v. Mineta*,
357 F.3d 632 (6th Cir. 2004)............................................................................... 17

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) ............................................................................ 21

*Bennet v. Spear*,
520 U.S. 154 (1997)............................................................................................. 16

*Brock v. Roadway Exp., Inc.*,
481 U.S. 252 (1987) ............................................................................................ 13

*Butz v. Economou*,
438 U.S. 478 (1978)............................................................................................. 13

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)............................................................................. 20

*Chilean Nitrate Corp. v. United States*,
11 C.I.T. 538 (1987)............................................................................................ 19

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ........................................................................... 17

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)..............................................................................................11

*Ford Motor Co. v. United States*,
44 F. Supp. 3d 1330 (Ct. Int'l Trade 2015)......................................................... 12

*Hylsa v. United States*,
22 C.I.T. 44 (1998)........................................................................................ 14, 15

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019).................................................. 20, 21

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 21

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)................................................................................................ 12, 13

*Memphis Light, Gas & Water Div. v. Craft*,
  436 U.S. 1 (1978)......................................................................................................... 12

*NEC Corp. v. United States*,
  151 F.3d 1361 (Fed. Cir. 1998).................................................................................... 15

*Ninestar Corp. v. United States*,
  666 F. Supp. 3d 1351 (Ct. Int'l Trade 2023)................................................................ 14

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................................................... 10

*Phoenix Metal Co. v. United States*,
  2024 WL 2891503 (Ct. Int'l Trade June 10, 2024)...................................................... 12

*PSC VSMPO-Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012).......................................................................................11

*Queen's Flowers de Colombia v. United States*,
  947 F. Supp. 503 (Ct. Int'l Trade 1996)....................................................................... 19

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) .................................................................................... 20

*Royal Brush Mfg., Inc. v. United States*,
  75 F. 4th 1250 (Fed. Cir. 2023)..................................................................................... 10

*Scripps-Howard Radio, Inc. v. FCC*,
  316 U.S. 4 (1942)........................................................................................................... 15

*Shree Rama Enters. v. United States*,
  983 F. Supp. 192 (Ct. Int'l Trade 1997)....................................................................... 19

*Superior Comm. Sols., LLC v. United States*,
  811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025)................................................................11

*Sys. Application & Techs., Inc. v. United States*,
  691 F.3d 1374 (Fed. Cir. 2012)..................................................................................... 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016)....................................................................................................... 17

*Vietnam Finewood Co. Ltd. v. United States*,
  466 F. Supp. 3d 1273 (Ct. Int'l Trade 2020)................................................................ 15

iv

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................................ 10

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) ........................................................................................ 20

**Statutes**

19 U.S.C. § 1517 ............................................................................................................... 14

19 U.S.C. § 1517(e) ........................................................................................................... 14

19 U.S.C. § 1517(g)(3) ...................................................................................................... 15

28 U.S.C. § 1581 ............................................................................................................... 14

28 U.S.C. § 1581(c) ..................................................................................................... 14, 15

28 U.S.C. § 1581(i) ........................................................................................................... 15

28 U.S.C. § 1581(i)(1)(D) ................................................................................................. 14

28 U.S.C. § 2640(e) ........................................................................................................... 15

5 U.S.C. § 704 .................................................................................................................... 15

**Regulations**

19 C.F.R. § 165.15(d)(1) .....................................................................................................11

19 C.F.R. § 165.27(c) ......................................................................................................... 17

**Other Authorities**

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China:
  Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final
  Determination of Countervailing Duty Investigation and Countervailing Duty Order*,
  90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) .................................................... 2, 3

v

**UNITED STATES COURT OF INTERNATIONAL TRADE**

ICON EV LLC,

               *Plaintiff,*

       v.

UNITED STATES; U.S. CUSTOMS AND BORDER
PROTECTION; and ERIC CHOY, in his official
capacity as Executive Director, Trade Remedy Law
Enforcement Directorate, Office of Trade, U.S.
Customs and Border Protection,

               *Defendants.*

Court No. 26-02759

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

The Fifth Amendment to the U.S. Constitution has guaranteed since our nation's founding
that "[n]o person shall be ... deprived of life, liberty, or property without due process of law."  The
Executive Branch, like all other parts of the federal government, must honor that guarantee.  But
in this case, U.S. Customs and Border Protection (Customs) ignored it.  Without any notice or
meaningful opportunity to be heard, Customs imposed so-called "interim measures" under the
Enforce and Protect Act (EAPA) on a U.S.-based importer, plaintiff ICON EV LLC, amounting to
sanctions that will quickly render ICON insolvent.  And Customs did so despite this Court already
holding that importers are entitled to notice and an opportunity to be heard before interim measures
are imposed.

For the Court to enjoin these interim measures, ICON need only demonstrate that it is more
likely than not to succeed.  And, as discussed below, ICON is likely to succeed as to the merits,
jurisdiction, and irreparable harm: Customs' interim measures were imposed without due process
and will imminently put ICON out of business, engendering a final agency action reviewable now
under the Court's residual jurisdiction.  Moreover, the balance of the equities and public interest

favor abiding by the Constitution and the Court's decisions, rather than permitting Customs to violate them. The Court should therefore grant ICON a temporary restraining order and preliminary injunction enjoining enforcement of the interim measures (except to the extent that they merely extend or suspend liquidation) during the pendency of Customs' EAPA investigation.

## BACKGROUND

I.    **ICON's Electric Golf Carts are Manufactured in Vietnam using Vietnamese Frames and Other Significant Vietnamese Inputs**

ICON is a U.S.-based importer of record that imports certain proprietary models of electric golf carts (the "merchandise"). Ex. 1, Declaration of Roy Williams (Williams Decl.) ¶ 2. It is also the ultimate consignee of the same merchandise imported by Marxon Energy Inc. and is responsible for the payment of all duties owed on Marxon's entries. *Id.* ¶ 3. ICON has been in business since 2017 and employs about 134 employees between its headquarters in Brandon, Florida, and two production facilities, a service center, and sales and marketing teams located across the United States. *Id.* ¶ 5. A network of over 350 dealers nationwide offers ICON's merchandise for sale to U.S. consumers. *Id.* ¶ 4. In addition to creating jobs for U.S. citizens, ICON is also committed to supporting charitable organizations in the communities that it serves, including giving back to organizations like the Make-A-Wish Foundation, Florida's Selfless Love Foundation, The Moffitt Cancer Center, and Memorial Healthcare Systems. *Id.* ¶ 6.

In August 2025, the U.S. Department of Commerce issued an antidumping and countervailing duty order on low-speed personal transportation vehicles (LSPTVs) from the People's Republic of China. *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (the Orders). The

2

Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, as defined by the scope:

> An unfinished and/or unassembled LSPTV subject to these orders covers at a minimum a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders.  The inclusion of other products, components, or assemblies not described here does not remove the product from the scope….
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country.  Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

Orders, 90 Fed. Reg. at 38,763.  Subject merchandise must therefore contain *at least* a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame … with front and/or rear suspension components … installed and powertrain components … installed or ready for installation." *Id.*

The Orders do not cover ICON's merchandise.  ICON's merchandise does not contain Chinese-origin rolling chassis.  Williams Decl. ¶ 8.  The rolling chassis in ICON's merchandise are in fact of Vietnamese origin.  *Id.*  The frames in ICON's merchandise, among other significant components, were produced in Vietnam.  *Id.*  About 60 to 70 percent of the content of ICON's merchandise is Vietnamese origin.  *Id.*

3

**II.     Without Any Notice or Opportunity to be Heard—and Without Actually Determining that ICON's Merchandise is Subject to the Antidumping and Countervailing Duty Orders Covering Chinese Electric Golf Carts—Customs Imposes Interim Measures Amounting to Sanctions**

On March 30, 2026, however, Customs notified ICON that, "[b]ased on a review of available information, [Customs] has determined that there is reasonable suspicion of evasion of antidumping (AD) and countervailing (CVD) duties by ICON," among other importers.  In the same communication on March 30, 2026, Customs also notified ICON that Customs "shall implement the following interim measures":

- Extend liquidation of unliquidated entries that entered before the date of initiation of the investigation (December 30, 2025);

- Suspend liquidation of unliquidated entries entered on or after the date of initiation of the investigation, December 30, 2025, and reject any entry summaries and require a re-file for those entries that are within the entry summary reject period;

- Require "live" entry for all imports of LSPTV from China and Vietnam by the Importers, requiring the Importers to submit proper documentation and all duties prior to release of the merchandise;

- The AD/CVD rates are the "all others" rate [*i.e.*, a combined AD/CVD cash-deposit rate of 519.23 percent *ad valorem*] on LSPTV and parts, if the U.S. Department of Commerce has not determined a separate rate that would apply to that entry.

Ex. 2, Email from Customs.

ICON had no prior knowledge of the basis for Customs' suspicion of evasion or of the basis for the EAPA allegation that prompted Customs' determination.  Williams Decl. ¶¶ 11–12.  ICON received no notice that an EAPA allegation had been received by Customs, that Customs had commenced an EAPA investigation, or that Customs was contemplating imposing interim

4

measures. *Id.* ¶ 13. Nor was ICON afforded a meaningful opportunity to respond before Customs imposed interim measures. *Id.* ¶ 14. Customs did issue CF-28s—formal requests for information—as to a handful of ICON and Marxon entries of merchandise. But those CF-28s were specific to a limited set of entries, and did not reference any EAPA allegation, EAPA investigation, or contemplated interim measures. *Id.* ¶¶ 9–10. Moreover, in response to at least one of these CF-28s, ICON proved to Customs' satisfaction that entries which Customs itself had changed to type 03 (AD/CVD entry) following importation should be reverted to type 01 (consumption entry) from type 03. *Id.* ¶ 10.

Customs' letter providing after-the-fact notice of initiation of an EAPA investigation ignores all information provided to Customs by ICON in its response to the CF-28, paraphrases the scope of the Orders to such an extent that it would cover any and all imports of carts and parts of carts in any condition, and equates compliance efforts and lawful tariff engineering with evasion. *See* Ex. 3, Notice of Initiation, EAPA Investigation 8247 ("Customs' letter"). As just one example, Customs alleges in its letter that "recent shipments" of ICON carts were broken down prior to importation into "smaller parts, with frames and suspension components imported separately" and relies on this description as a basis for its reasonable suspicion of evasion. *Id.* But that fact, which ICON readily disclosed to Customs in responding to the CF-28, has nothing to do with evasion or the origin of the carts or their rolling chassis, which ICON already proved to Customs were Vietnamese. Instead of creating reasonable suspicion of evasion, these facts demonstrate the opposite: the extensive efforts that ICON has taken to *comply* with the Orders.

Similarly, Customs relied on stale, incomplete information as a basis for its "reasonable suspicion" of evasion. It failed to account for the evidence ICON has presented to Customs over the last 9 months, including consistent and transparent communications with Customs regarding

the steps that ICON has taken to comply with the Orders. Williams Decl. ¶¶ 9–10. ICON provided detailed product information in response to Customs actions, including in its CF-28 responses filed in April and May 2025. *Id.* ¶ 10. Therein, ICON described in detail the process of gradually shifting its supply chain to Vietnam, including establishing that entries starting in July 2025 have Vietnam-origin rolling chassis and that entries starting in December 2025 have 60% or more Vietnamese material content (not accounting for Vietnam labor). *Id.* To evidence its compliance with the Orders, ICON provided two detailed origin verifications on successive builds and a virtual tour of the Vietnam factory. *Id.* In fact, after the first origin verification and virtual tour, Customs reverted June and July entries of carts which Customs had changed to type 03 entries back to type 01 status. *Id.*

Customs' letter does not consider these inconvenient facts, *see* Ex. 3, which ICON would have presented if given an opportunity to be heard prior to the implementation of the interim orders. Earlier entries of carts with less Vietnamese content were deemed correctly classified as type 01 entries by Customs—yet, according to Customs' letter, later entries of carts since December 2025, with even more Vietnamese content and Vietnamese frames, are somehow not. The evidence that Customs *already has* suggests that the entries of carts upon which the interim measures were imposed are not within the Orders' scope. But neglecting to consider that evidence cannot create "reasonable" suspicion of evasion sufficient to impose business-ending interim measures.

The interim measures that Customs imposed will, if not enjoined by this Court, irreparably harm ICON. For one, interim measures will put ICON out of business by the end of this month. In addition to imposing an insurmountable financial burden going forward, the interim measures effectively require ICON to immediately pay Customs millions of dollars. *Id.* ¶ 20. ICON does

not have the ability to pay this amount or obtain any financing to help it pay. *Id.* ¶¶ 20–28. ICON currently operates with an asset-based loan (ABL) that requires the company to have assets in the form of its inventory of carts. *Id.* ¶ 21. The ABL provides financing to purchase new assets and meet operational needs so ICON can build and sell the carts and pay the loan down. *Id.* The ABL is not sufficient to cover the over 500% in antidumping and countervailing duties imposed by the interim measures on both past and future imports of carts. *Id.* ¶¶ 21–28. As it cannot pay for new inventory, the interim measures effectively prevent ICON from importing new carts to fulfill existing or new orders and meeting payroll and overhead. *Id.* ICON will default on its loan obligations and be forced to cease operations within one month, impacting not only itself, but also those upstream and downstream companies it does business with and 56,100 U.S. customers who will be left with no warranty-repair services. *See, e.g., id.* ¶¶ 16, 19, 26, 30, 31. Indeed, declarations from dealers that are representative of the over 350 dealers that sell ICON's carts, as well as a declaration from ICON's battery supplier, confirm that ICON's suppliers, businesses, employees, and customers will all be harmed by the interim measures. Ex. 4, Declaration of Skylar Schone (ECO Battery Decl.) ¶¶ 7–9 ("The downstream effects on our business will be significant. We have invested heavily in U.S. manufacturing and currently employ a substantial workforce across multiple states. A material reduction in demand from ICON will likely require us to scale back operations, delay or cancel planned investments, and potentially reduce our workforce."); Ex. 5, Declaration of Tyson Scheumann (Captain Spiffy LLC Decl.) ¶¶ 8–11 ("This abrupt and significant price increase … negatively affects our current and projected sales, and places immediate strain on our financial performance. … If implemented, this action will significantly limit parts availability to our existing customer base and materially degrade our ability to service

those customers promptly[.]"); Ex. 6, Declaration of Paul and Tracy Spraetz (Resort Life Carts Decl.) ¶¶ 3–8.

For another, the interim measures inflict unrecoverable damage to ICON's goodwill, reputation, business opportunities, and market share. Williams Decl. ¶ 24. ICON has already been forced to raise its prices as high as it could—just to survive to the end of this month. *Id.* That has already harmed ICON's reputation and relationships with dealers and customers. *Id.* And the Court need not take ICON's word for it: ICON's battery supplier and dealers of ICON's carts confirm that goodwill has been lost and that they will stop doing business with ICON if interim measures remain in place. ECO Battery Decl. ¶ 9 ("If these measures are not stopped, we will have no choice but to explore other business opportunities with other buyers of our U.S. Designed and supported battery systems."); Captain Spiffy LLC Decl. ¶¶ 9, 12 ("These customers are now faced with higher prices without warning, which reflects poorly on our dealership and erodes trust. … If ICON were to significantly increase prices further … we would be compelled to cease doing business with ICON altogether, as such pricing would be commercially unviable and unacceptable to our customer base."); Resort Life Carts Decl. ¶¶ 6–8 ("This is not just an operational inconvenience—it is actively affecting our relationships with our customers and beginning to impact our reputation within the community we serve…. If ICON cannot provide predictable pricing and necessary warranty parts, our business will continue to suffer and we will have no choice but to pursue business opportunities with other manufacturers.").

ICON has no practical ability to stem any of these irreparable harms. It cannot cut costs and reduce the quality of its carts. Williams Decl. ¶ 25. Even if it could, that would just increase its unrecoverable injuries to goodwill, reputation, business opportunities, sales, and market share. *See id.* ¶¶ 24–25. It cannot somehow cut all of its expenses. *Id.* ¶ 25. Even if it could, it would

*still* have a serious budget shortfall necessitating its imminent closure. *Id.* It cannot raise its prices any higher. *Id.* ¶¶ 23–24. Even if it could, it would again only increase its unrecoverable injuries to goodwill, reputation, business opportunities, sales, and market share. *See id.* And it cannot source or manufacture substantial components or carts in the United States without any ability to obtain financing. *Id.* ¶ 29.

**<u>SUMMARY OF ARGUMENT</u>**

The Court should grant ICON's motion and enjoin the interim measures. First, ICON is likely to succeed on its claim that Customs violated ICON's Fifth Amendment right to due process when it imposed interim measures without providing ICON prior notice or a meaningful opportunity to be heard. This Court has already held that this is a due-process violation. And even if it had not, Supreme Court precedent makes clear that Customs' refusal to provide ICON predeprivation process was unlawful.

ICON is also likely to establish this Court's jurisdiction to remedy Customs' unconstitutional actions now. Congress did not expand this Court's jurisdiction to referee trade-related disputes only to have it sit on the sidelines as Customs racks up fouls. Congress in fact expected that this Court would exercise its jurisdiction in EAPA cases in circumstances other than reviewing a final evasion determination. This Court's residual jurisdiction thus provides an avenue for the Court to redress injuries resulting from interim measures that have truly final effect—and that is the case here. Unless this Court exercises its jurisdiction, Customs would have free reign to unconstitutionally bankrupt importers through interim measures—imposing whatever duties it likes—effectively insulating its final evasion determinations from judicial review.

The remaining injunctive-relief factors favor ICON. ICON will be irreparably harmed by Customs' unlawful interim measures absent immediate relief. Due to the interim measures, ICON

9

will go out of business by the end of the month—even if all the money that Customs is now demanding were refunded at the end of the EAPA investigation. And the balance of the equities and the public interest—which merge where the government is the defendant—also favor ICON. Constitutional violations are never in the public interest. Nor does affording an importer the bare-minimum process due while an EAPA investigation unfolds impair Customs' ability to investigate and remedy duty evasion. If anything, it enhances Customs' decision-making process.

The Court should grant ICON's motion and enjoin the interim measures.

## ARGUMENT

### I.    Standard of Review

The Court considers four factors in deciding whether to grant a temporary restraining order or preliminary injunction: (1) whether the movant "is likely to succeed on the merits," (2) whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) whether the "balance of equities tips in [the movant's] favor," and (4) whether "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge where, as here, the government "is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### II.    ICON is Likely to Succeed on the Merits Because Customs Failed to Provide ICON Predeprivation Notice or a Meaningful Opportunity to be Heard, in Violation of the Fifth Amendment

Customs' decision to impose bankrupting interim measures—without any notice or opportunity to respond to the allegation that prompted those measures—violated ICON's right to due process. The due-process clause of the Fifth Amendment to the U.S. Constitution governs Customs' conduct in EAPA investigations. *Royal Brush Mfg., Inc. v. United States*, 75 F. 4th 1250, 1259 (Fed. Cir. 2023). ICON's constitutional right to due process entitles it "to notice and a meaningful opportunity to be heard" before, not after, a deprivation occurs. *PSC VSMPO-Avisma*

10

*Corp. v. United States*, 688 F.3d 751, 761–66 (Fed. Cir. 2012); *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("some form of pretermination hearing" is generally required).

This Court has already held, based on Supreme Court and Federal Circuit precedent, that Customs' conduct in this case violates the Fifth Amendment.  In *Superior Commercial Solutions, LLC v. United States*, Customs imposed interim measures subjecting unliquidated entries to a combined AD/CVD cash deposit rate of 371.46% *ad valorem*.  811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025).  But Customs failed to provide the plaintiff "an opportunity to offer evidence and make administrative arguments prior to the imposition" of these interim measures, as it provided notice of the EAPA investigation at the same time as it imposed them.  *Id.*  (The Court reached that conclusion despite the government's argument that Customs had previously issued a CF-28 to the plaintiff in response to which the plaintiff allegedly failed to "provide numerous types of information." *Superior Commercial Sols., LLC v. United States*, Court No. 24-00052, ECF No. 26 at 28 (Ct. Int'l Trade Nov. 15, 2024).)  The Court then held that Customs' conduct, as well as 19 C.F.R. § 165.15(d)(1) itself, violates Fifth Amendment due process, because "a meaningful opportunity to respond should happen *before* a temporary deprivation takes effect, not afterwards." 811 F. Supp. 3d at 1376–77 (emphasis added).

This case is virtually identical to *Superior Commercial Solutions*: there, as here, Customs provided no notice or opportunity to be heard before imposing steep AD/CVD cash-deposit rates and live entry requirements that will put ICON out of business within a month.  That is just as much a due-process violation as it was in *Superior Commercial Solutions*, if not more so given the combined 519.23 percent *ad valorem* cash-deposit rate.

11

The result is the same even starting from first principles. The Supreme Court's seminal decision in *Mathews v. Eldridge* sets forth the test for determining what process is due under the Fifth Amendment, considering the private interest at stake, the risk of erroneous deprivation, and the public interest. 424 U.S. 319, 335 (1976). Each factor supports a requirement that Customs afford importers like ICON notice and an opportunity to be heard *before* interim measures are imposed.

Start with the private interest at stake. "The combination of cash deposits for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a large amount of cash with Customs before it can even complete the sale for which it is importing the goods." *Phoenix Metal Co. v. United States*, 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024). "Live entries are so onerous that they have previously been compared to sanctions." *Id.* (citing *Ford Motor Co. v. United States*, 44 F. Supp. 3d 1330, 1339 n.16 (Ct. Int'l Trade 2015)). And, although unlawfully imposed monetary exactions can be refunded, ICON has no practical ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. Once ICON goes out of business, a refund a year or more later is no remedy at all—the damage is already done. To put the same point another way, even if these measures may ultimately be lifted, their imposition "for any appreciable time works a uniquely final deprivation." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978).

Next, consider the high risk of erroneous deprivation through the imposition of interim measures in EAPA investigations. Customs applies a "reasonable-suspicion" standard based on allegations submitted by interested parties like competitors, rather than a preponderance-of-the-evidence standard based on "unbiased" reports from disinterested parties. *Mathews*, 424 U.S. at 344. That naturally lends itself to erroneously imposed interim measures. And that risk

12

materialized in this case. Customs' determination to impose these severe interim measures was based on its "reasonable suspicion" that ICON, according to an allegation submitted by one of its competitors, had transshipped or misclassified its merchandise. But ICON's merchandise does not contain any Chinese rolling chassis. Had ICON been afforded the process that this Court had already held it is constitutionally entitled to, ICON could have demonstrated to Customs that its merchandise is not subject to the Orders (as it has done already in response to the CF-28), and Customs could have declined to impose these severe interim measures in the first place. Thus, without "some kind of a hearing ensuring an effective initial check against mistaken decisions," Customs' conduct violates the Fifth Amendment. *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 261 (1987) (quotation omitted).

Finally, the public interest would not be impaired by affording importers like ICON mere notice and a meaningful opportunity to be heard before interim measures are imposed. *Cf. Mathews*, 424 U.S. at 347–48. A full-blown evidentiary hearing on the record is not necessarily required. But by the time Customs imposed interim measures, it had already been sitting on an EAPA allegation for months. In this case, the allegation was filed on October 10, 2025, and Customs initiated its investigation on December 30, 2025. It should not cost the government much, if anything, to afford importers time to make a documentary submission directly in response to an allegation of evasion before Customs decides whether to impose interim measures. If anything, providing importers notice and an opportunity to respond before interim measures are imposed would "tend to enhance the reliability of information and the impartiality of the decisionmaking process," leading to "a less pressing need for individual suits to correct constitutional error." *Butz v. Economou*, 438 U.S. 478, 512 (1978).

Accordingly, both because this Court has already said so, and because Supreme Court precedent leads to the same result, ICON is likely to succeed on the merits of its due-process challenge to Customs' interim measures.

### III.    This Court has Jurisdiction to Remedy Customs' Unconstitutionally Imposed Interim Measures Now

The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D). *See Ninestar Corp. v. United States*, 666 F. Supp. 3d 1351, 1359 (Ct. Int'l Trade 2023) (movant need only show that it is "likely to establish subject matter jurisdiction"). Section 1581(i)(1)(D) confers on this Court "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … administration and enforcement with respect to the matters referred to in … subsections (a)–(h) of this section." This civil action challenges Customs' imposition of interim measures under 19 U.S.C. § 1517(e), a law of the United States that provides for administration and enforcement with respect to the matters referred to in subsection (c) of 28 U.S.C. § 1581—namely, section 517 of the Tariff Act of 1930 (19 U.S.C. § 1517).

Waiting for a final evasion determination and review under 28 U.S.C. § 1581(c), by contrast, "would be manifestly inadequate." *Hylsa v. United States*, 22 C.I.T. 44, 46 (1998). Unless this Court exercises its residual jurisdiction, Customs will have the power to bankrupt importers like ICON through unlawful interim measures and effectively insulate its decisions in EAPA investigations from judicial correction. That is, if the interim measures are not enjoined, ICON will no longer exist by the end of Customs' EAPA investigation, regardless of which way the evasion determination comes out. This "grave economic harm which cannot be addressed pursuant to 1581(a-h)" justifies exercising residual jurisdiction under 28 U.S.C. § 1581(i)(1)(D). *Hylsa*, 22 C.I.T. at 48. As the Supreme Court has explained in a similar context, "[i]f the

14

administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1942).

Indeed, Congress anticipated that 28 U.S.C. § 1581(c) would not be the exclusive means for obtaining judicial review of unlawful actions that Customs takes in EAPA investigations. In EAPA itself, Congress provided that "[n]othing" in the subsection of the statute governing judicial review "shall affect the availability of judicial review to an interested party under any other provision of law." 19 U.S.C. § 1517(g)(3). That provision would be meaningless if this Court could only review Customs' "final" evasion determinations and not, in appropriate instances, Customs' alleged violations of law in EAPA investigations that have final, business-ending effect. *See also NEC Corp. v. United States*, 151 F.3d 1361, 1368–69 (Fed. Cir. 1998) (agreeing that forcing a plaintiff to wait to raise a due-process argument under § 1581(c) after a Commerce investigation concluded, instead of proceeding immediately under § 1581(i), was a "fool's errand").[1]

The interim measures imposed here also constitute reviewable final agency action within the meaning of 5 U.S.C. § 704. *See* 28 U.S.C. § 2640(e) (applying the Administrative Procedure Act (APA) to actions brought under 28 U.S.C. § 1581(i)). The Supreme Court has instructed that

---

[1] *Vietnam Finewood Co. Ltd. v. United States*, 466 F. Supp. 3d 1273 (Ct. Int'l Trade 2020), is not to the contrary. There, this Court explained that Customs' imposition of interim measures is normally reviewable under 28 U.S.C. § 1581(c) after a final evasion determination. *Id.* at 1284. But the plaintiffs merely argued "that the remedy afforded by the court's (c) jurisdiction is manifestly inadequate because CBP failed to issue a final determination by the purported statutory deadline." *Id.* at 1284 n.12. They did not argue, as ICON does here, that jurisdiction is manifestly inadequate under § 1581(c) because the plaintiff will not exist by the time of a final evasion determination. *See id.*; *Hylsa*, 22 C.I.T. at 48.

15

the APA's finality requirement is to be applied in a "pragmatic," "flexible" way. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citation omitted). As evidenced by their immediate legal effect on ICON's imports and immense financial burden on ICON, the interim measures plainly have "legal consequences" and determine "rights or obligations," meeting the second part of the *Bennet* test. *Id.*

Further, the particular interim measures that Customs imposed here also meet the first part of the *Bennet* test. These measures, despite the "interim" moniker, represent the "consummation" of Customs' decision-making process as to those measures and are not "of a merely tentative or interlocutory nature," *id.* (quotation omitted), for two independent reasons.

First, these interim measures are "final" in the APA sense because, although their effect may be time-limited, they are not subject to administrative reconsideration. Customs "memorialized its decision to take corrective action in" an email to ICON, stating that it "*has determined* that there is reasonable suspicion of evasion of antidumping (AD) and countervailing (CVD) duties by ICON," Ex. 3. *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1384 (Fed. Cir. 2012) (emphasizing that an agency communication declaring that the agency "has determined" something connotes final agency action). There is "nothing interlocutory, uncertain, or tentative about this declaration." *Id.* Not only did Customs "declare its decision to" impose interim measures "but it [also] set in motion several irretrievable legal consequences," including requiring live entry. *Id.* Indeed, interim measures are not "revisited" once the EAPA investigation

16

"process moves forward," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); rather, they are simply lifted upon a negative evasion determination. 19 C.F.R. § 165.27(c). Simply put, there is nothing "advisory" about Customs' decision to imposition interim measures. *Hawkes Co.*, 578 U.S. at 597 (quotation omitted).

Second, even if interim measures *generally* could be thought of as interlocutory in some way (and for the reasons above, they should not be), the interim measures *in this case* would nevertheless reflect "final" agency action as to the purely legal question of Customs' authority to issue them without notice or an opportunity to be heard. Two cases demonstrate this point: *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632 (6th Cir. 2004) (Sutton, J.), and *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986). In *Air Brake Systems*, the plaintiff challenged both the content of an advisory letter from an agency and the agency's authority to issue it in the manner that it did. 357 F.3d at 646. Although the court held that there was no final agency action as to the letter's content, the court determined that there *was* final agency action as to the legal question of the agency's authority to issue the letter in the first place. *Id.* at 646–47. Similarly, in *Ciba-Geigy Corp.*, the court held that the agency's pronouncements as to the procedures it could use to require labeling changes constituted final agency action, even though the agency had not yet issued any final order as to the plaintiff. 801 F.2d at 432–39. The case presented a "purely legal issue" as to the agency's authority that would not be "facilitated by further factual development," *id.* at 435; there was "no indication that" the agency's position "was subject to further" change," *id.* at 437; and the agency's pronouncements had significant legal effects on the plaintiff. *Id.* Similarly, here, the issue of whether Customs can impose bank-breaking interim measures without affording importers due process is a purely legal one that requires no assessment of the underlying allegation, the facts, or further intra-agency percolation.

17

Accordingly, this Court likely has the power to issue injunctive relief now.

## IV.    ICON Will be Irreparably Harmed Absent Injunctive Relief

Apart from ICON's likelihood of success on the merits, an injunction is also warranted because ICON will suffer irreparable harm without one. As detailed above—and as supported not only through declarations but also hard financial evidence—the interim measures will put ICON out of business by the end of this month. *See* Ex. 7, 2024 Audited Financials; Ex. 8, December 2025 Monthly Management Report (confirming ICON's current financial situation as discussed in the Williams Declaration). They effectively require ICON to immediately pay Customs many millions of dollars on Vietnam origin carts, which will bankrupt ICON. Williams Decl. ¶¶ 16, 20. ICON's source of financing—an ABL—requires the company to have assets in the form of its inventory of carts. *Id.* ¶ 21. But the ABL is not sufficient to cover the over 500% in antidumping and countervailing duties imposed by the interim measures on both past and future imports of carts. *Id.* ¶¶ 21, 26*.* And because it cannot pay for new inventory, the interim measures effectively prevent ICON from importing new carts to fulfill existing or new orders and meeting payroll and overhead. *Id.* ¶¶ 17–18, 21. ICON will default on its loan obligations and be forced to cease operations with one month, impacting not only itself, but also dealers, suppliers, and tens of thousands of U.S. customers who will be left with no warranty-repair services. *See, e.g.*, *id.* ¶¶ 16, 19, 26, 30, 31. Declarations from third parties—two dealers of ICON's carts, as well as ICON's battery supplier—confirm that their businesses, employees, and customers will be harmed by the interim measures. ECO Battery Decl. ¶¶ 7–9; Captain Spiffy LLC Decl. ¶¶ 8–11; Resort Life Carts Decl. ¶¶ 3–8.

Additionally, as discussed above, the interim measures inflict unrecoverable damage to ICON's goodwill, reputation, business opportunities, and market share. *Id.* ¶ 24. Again, third-

18

party declarations confirm this. ECO Battery Decl. ¶ 9 ("If these measures are not stopped, we will have no choice but to explore other business opportunities with other buyers of our U.S. Designed and supported battery systems."); Captain Spiffy LLC Decl. ¶¶ 9, 12 ("These customers are now faced with higher prices without warning, which reflects poorly on our dealership and erodes trust. … If ICON were to significantly increase prices further … we would be compelled to cease doing business with ICON altogether, as such pricing would be commercially unviable and unacceptable to our customer base."); Resort Life Carts Decl. ¶¶ 6–8 ("If ICON cannot provide predictable pricing and necessary warranty parts, our business will continue to suffer and we will have no choice but to pursue business opportunities with other manufacturers.").

Nor does ICON have any ability to prevent these irreparable harms from occurring. Cutting corners, cutting all of its expenses, raising prices, and sourcing or manufacturing in the United States to a sufficient degree to make a meaningful difference in the face of the interim measures are all impossibilities for ICON. Williams Decl. ¶¶ 22–29. And even if they somehow were not, taking any or all of those actions would simply increase ICON's unrecoverable injuries to goodwill, reputation, business opportunities, and market share. *See id.* ¶¶ 23–24. In sum, this is not a case where a plaintiff is simply complaining about "significant and permanent monetary injury as a consequence of posting large cash deposits." *Shree Rama Enters. v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997) (quoting *Chilean Nitrate Corp. v. United States*, 11 C.I.T. 538, 540 (1987)). This is a case where the plaintiff has shown that it faces "immediate extinction." *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 507 (Ct. Int'l Trade 1996).

That a refund of unlawfully imposed duties would be available at the conclusion of an EAPA investigation does not render ICON's imminent injuries reparable. "[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis*

*in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).  Thus, "a damage remedy" that is not "a meaningful one" cannot negate irreparable harm.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  That is the case here.  ICON is facing insolvency within a month as a result of the interim measures.  But a refund to an entity that no longer exists is no remedy.  Nor could a refund repair goodwill, reputation, business relationships, and market share lost while ICON waits for Customs to reach an evasion determination.

ICON "has suffered a procedural harm flowing from a likely violation of the APA" and the Constitution that is irreparable without an injunction.  *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (Ct. Int'l Trade 2019).  Because of Customs' violation of the law, and regardless of whether Customs later "cures" that violation through a negative determination of evasion, ICON will in the meantime "have to adjust [its] business plans and behavior accordingly to reflect the imposition of significant additional duties, resulting in lost business opportunities" and "cancelled or significantly reduce[d] projects"—assuming it can even survive long enough to suffer these significant, non-compensable consequences.  *Id.* (quotation omitted).  Indeed, ICON has already had to increase its prices just to survive to the end of this month.  Williams Decl. ¶ 24. Judicial review after an evasion determination, however, cannot fix any of this.  Thus, ICON, because of these likely harms and its imminent insolvency, "would thereby lose any opportunity for meaningful judicial review."  *Invenergy*, 422 F. Supp. 3d at 1291.  And "the abrogation of effective judicial review" constitutes "sufficient irreparable injury" justifying injunctive relief. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983).

Either way, without an injunction, ICON will suffer irreparable injury directly stemming from Customs' unconstitutionally imposed interim measures.

## V.    The Balance of the Equities and Public Interest Favor ICON

The balance of the equities and the public interest (factors that merge when the government is the defendant) likewise favor ICON.   "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010).  The public interest would be undermined, by contrast, if Customs were permitted to flout its constitutional obligations to importers.  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operation." (cleaned up)).  Thus, the injunction that ICON seeks would promote the public's ever-dire interest in "process and fidelity to law," which hardly imposes a burden on the government.  *See Invenergy*, 422 F. Supp. 3d at 1293–94 ("Any harms suffered by the Government … are a direct result of [the agency's] failure to follow the APA," and as such "[t]he balance of equities … tips decidedly in favor of the Plaintiffs.").

Nor would an injunction impair Customs' legitimate interest in protecting the revenue.  As detailed above, although the interim measures apply to entries made on or after December 30, 2025, these entries consist of carts with Vietnamese frames and over 60% Vietnamese material content, not including labor.  Prior verifications conducted by Customs demonstrated that a substantial level of production occurs in Vietnam.  The carts to which the interim measures are being applied are thus not subject to the Orders, and Customs lacks a reasonable basis for concluding otherwise.  Customs accordingly lacks any legitimate interest in assessing AD/CVD duties to protect revenue.  Additionally, the scope of the injunction that ICON seeks is limited and adequately accounts for Customs' interests.  ICON does not seek to prevent Customs from

21

conducting its EAPA investigation, or from extending or suspending liquidation while the EAPA investigation plays out. Rather, ICON seeks only to enjoin Customs from rejecting entries, requiring re-filing and live entry, and subjecting Vietnam imports to the AD/CVD cash-deposit rate. This limited relief would provide ICON an opportunity to defend itself in the EAPA investigation—which is what the Constitution entitles ICON to and is all that ICON asks for.

## CONCLUSION

For these reasons, the Court should grant ICON's motion and enjoin the interim measures.

Dated: April 13, 2026

Respectfully submitted,

/s/ Luke Mathers
Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-01609
lmathers@strtrade.com

22

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing submission complies with the word-limitation set forth in Standard Chambers Procedure 2(B)(1), and contains 6,803 words.

Dated: April 13, 2026

/s/ Luke Mathers
Luke Mathers