**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: JANE A. RESTANI, JUDGE**

ICON EV LLC,

*Plaintiff,*

v.

UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,

*Defendants,*

AMERICAN PERSONAL TRANSPORTATION VEHICLE MANUFACTURERS COALITION,

*Defendant-Intervenor.*

Court No. 26-02759

**PUBLIC VERSION**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**<u>AND JUDGMENT ON THE AGENCY RECORD</u>**

Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com

Dated: September 21, 2026

# TABLE OF CONTENTS


RULE 56.1 STATEMENT ........ 2

BACKGROUND ........ 3

I. The Department of Commerce Issued Antidumping and Countervailing Duty Orders on LSPTVs Covering, at a Minimum, Chinese-Origin Rolling Chassis Consisting of a Frame With Suspension and Powertrain Components ........ 3

II. ICON Imports Goods Lacking Chinese-Origin Rolling Chassis ........ 7

III. The Coalition Files an EAPA Allegation Against ICON that Misconstrues the *LSPTV Orders* and Relies on Stale, Innocuous Evidence ........ 12

IV. Customs Initiates its Investigation Based Largely on the Coalition's Allegation ........ 16

V. Customs Provides Notice of the EAPA Investigation and at the Same Time Imposes the Interim Measures ........ 18

VI. The Court Enjoins Certain Interim Measures due to Customs' Failure to Provide ICON Due Process ........ 23

SUMMARY OF ARGUMENT ........ 25

ARGUMENT ........ 26

I. Standard of Review ........ 26

II. Customs Failed to Provide ICON Predeprivation Notice or a Meaningful Opportunity to be Heard, in Violation of the Fifth Amendment ........ 27

III. The Reasonable-Suspicion Standard, as Applied, Sets an Unconstitutionally Low Bar for the Imposition of the Challenged Interim Measures ........ 32

IV. Even if the Reasonable-Suspicion Standard Passed Constitutional Muster As-Applied, Customs Lacked the Reasonable Suspicion Necessary to Impose the Challenged Interim Measures ........ 37

V. The Court Should Issue Permanent Injunctive and Declaratory Relief ........ 45

CONCLUSION ........ 46

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*,
441 U.S. 418 (1979) ... 32, 33

*Am. Pac. Plywood, Inc. v. United States*,
2023 WL 4288346 (Ct. Int'l Trade June 22, 2023) ... 33

*AM/NS Calvert LLC v. United States*,
654 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ... 27

*Butz v. Economou*,
438 U.S. 478 (1978) ... 32

*CEK Grp. LLC v. United States*,
633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) ... 34, 37

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ... 28, 31, 36

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ... 29

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ... 45

*F.T.C. v. Standard Oil Co.*,
449 U.S. 232 (1980) ... 36

*Heien v. North Carolina*,
574 U.S. 54 (2014) ... 37

*ICON EV LLC v. United States*,
--- F. Supp. 3d ---, 2026 WL 1470148 (Ct. Int'l Trade May 26, 2026) ... 24

*ICON EV LLC v. United States*,
--- F. Supp. 3d ---, 2026 WL 2295795 (Ct. Int'l Trade Aug. 10, 2026) ... 25, 35

*ICON EV LLC v. United States*,
836 F. Supp. 3d 1361 (Ct. Int'l Trade 2026) ... *passim*

*JSC Acron v. United States*,
893 F. Supp. 2d 1337 (Ct. Int'l Trade 2013) ... 27

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) .......... 34

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... *passim*

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978) .......... 29

*Mullane v. Central Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) .......... 28, 36

*Ninestar Corp. v. United States*,
687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) .......... 36

*Phoenix Metal Co. v. United States*,
2024 WL 2891503 (Ct. Int'l Trade June 10, 2024) .......... 29, 34

*Rodriguez v. Dep't of Veterans Affs.*,
8 F.4th 1290 (Fed. Cir. 2021) .......... 33, 36

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .......... 28, 29, 36

*Sabey v. Butterfield*,
823 F. Supp. 3d 113 (D. Mass. 2026) .......... 34

*Santosky v. Kramer*,
455 U.S. 745 (1982) .......... 32, 33, 34

*Sgro v. United States*,
287 U.S. 206 (1932) .......... 30, 40

*Steffel v. Thompson*,
415 U.S. 452 (1974) .......... 46

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) .......... 28

*Tate v. Short*,
401 U.S. 395 (1971) .......... 34

*Terry v. Ohio*,
392 U.S. 1 (1968) .......... 33, 37

*Ulstein Maritime, Ltd. v. United States*,
833 F.2d 1052 (1st Cir. 1987) .......... 46

*United States v. Jones*,
619 F.2d 494 (5th Cir. 1980) .......... 30

*Valmonte v. Bane*,
18 F.3d 992 (2d Cir. 1994) .......... 35

*Vitek v. Jones*,
445 U.S. 480 (1980) .......... 33

*Woodby v. INS*,
385 U.S. 276 (1966) .......... 33

**Statutes**

19 U.S.C. § 1517 .......... 31

19 U.S.C. § 1517(a)(3) .......... 43

19 U.S.C. § 1517(b)(1) .......... 16, 35

19 U.S.C. § 1517(b)(4) .......... 37

19 U.S.C. § 1517(c)(1)(A) .......... 36

19 U.S.C. § 1517(e) .......... 33

19 U.S.C. § 1517(e)(3) .......... *passim*

19 U.S.C. § 1677j .......... 37

28 U.S.C. § 1581(i)(1)(D) .......... 26

28 U.S.C. § 2640(e) .......... 27

28 U.S.C. § 2643(c)(1) .......... 45

5 U.S.C. § 706(2) .......... 27

**Regulations**

19 C.F.R. § 101.1 .......... 17

**Other Authorities**

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*,
89 Fed. Reg. 96,942 (Dep't of Com. Dec. 6, 2024)................................................... 5

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Determination of Sale at Less-Than-Fair-Value Investigation, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*,
90 Fed. Reg. 8517 (Dep't of Com. Jan. 30, 2025)...................................................... 5

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*,
90 Fed. Reg. 38,759 (Dep't of Com. Aug. 12, 2025)................................................ 6, 7, 17, 38

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*,
90 Fed. Reg. 26,536, 26,539 (Dep't of Com. June 23, 2025).............................................. 7, 39

*Certain Low-Speed Transportation Vehicles from the People's Republic of China: Initiation of Countervailing Duty Investigation*,
89 Fed. Reg. 57,870 (Dep't of Com. July 16, 2024)................................................... 3

*Certain Low-Speed Transportation Vehicles from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*,
89 Fed. Reg. 57,865 (Dep't of Com. July 16, 2024)................................................. 3, 4

CSMS # 66200760 (Sept. 11, 2025 10:16 AM EDT) ................................................... 18

Letter from R. DeFrancesco, III to Hon. G. Raimondo and Hon. L. Barton re: Certain Low Speed Personal Transportation Vehicles from the People's Republic of China: Petitioner's Response to First Supplement Questionnaire Regarding Common Issues and Injury Volume I of the Petition, Inv. Nos. A-570-176 and C-570-177 (June 28, 2024) (Barcode 4586604-01)......... 4, 5

Lori Ann LaRocco, *President Trump's trade war hits his second-favorite set of wheels, the golf cart*, CNBC, https://www.cnbc.com/2025/04/30/tariffs-target-trumps-second-favorite-set-of-wheels-the-golf-cart.html (last updated May 5, 2025 12:46 PM EDT)............................... 3, 14

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: JANE A. RESTANI, JUDGE**

ICON EV LLC,

*Plaintiff,*

v.

UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,

*Defendants,*

AMERICAN PERSONAL TRANSPORTATION VEHICLE MANUFACTURERS COALITION,

*Defendant-Intervenor.*

Court No. 26-02759

**PUBLIC VERSION**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE AGENCY RECORD**

The undisputed facts and record evidence demonstrate that U.S. Customs and Border Protection violated ICON EV LLC's Fifth Amendment due process rights, and violated the Enforce and Protect Act (EAPA) itself, in imposing certain "interim measures." These interim measures, which Customs has the discretion not to impose at all, required ICON to immediately pay millions of dollars in antidumping and countervailing duty cash deposits on merchandise already imported, among other sanctions. Customs imposed these measures based only on "reasonable suspicion" of antidumping and countervailing duty evasion, and without any prior notice or meaningful opportunity to be heard. Moreover, Customs' "reasonable suspicion" was premised on an allegation from ICON's competitors that misconstrued the antidumping and countervailing duty

orders, and discounted ICON's responses to Customs' requests for information that demonstrated its imported golf carts were, in fact, *not* subject to those orders as written.

The Court should grant judgment in ICON's favor. Customs' actions in this case deprived ICON of its right to due process under the Fifth Amendment. For one, Customs imposed the interim measures without meeting the constitutional minimum of pre-deprivation notice or an opportunity to be heard. And for another, Customs imposed these measures under a reasonable-suspicion standard appropriate only for temporary, rather than final, deprivations. Additionally, separate and apart from these constitutional violations, Customs also violated EAPA by imposing the interim measures without reasonable suspicion of evasion—the evidence Customs identified to justify the imposition of these business-ending measures in fact demonstrated compliance with the antidumping and countervailing duty orders, was not suspicious, or was too stale as it concerned imports materially distinct from those affected by the interim measures.

For any of these reasons, ICON is entitled to judgment. The Court should accordingly enter judgment in ICON's favor and issue declaratory and permanent injunctive relief.

## RULE 56.1 STATEMENT

1. The administrative determination to be reviewed is Customs' April 6, 2026 Notice of Initiation. ECF No. 24-2.

2. Customs denied ICON due process by imposing interim measures under 19 U.S.C. §1517(e)(3) without notice or a meaningful opportunity to be heard. Additionally, the reasonable-suspicion standard, as applied, violates Fifth Amendment due process because it sets too low of an evidentiary bar. Finally, Customs lacked reasonable suspicion of evasion sufficient to justify the interim measures, as it misconstrued the antidumping and countervailing duty orders, relied on stale evidence, and deemed CF-28 responses "deficient" without reasonable explanation.

3. ICON requests an order permanently enjoining the interim measures and declaring that Customs violated the law.

## BACKGROUND

### I. The Department of Commerce Issued Antidumping and Countervailing Duty Orders on LSPTVs Covering, at a Minimum, Chinese-Origin Rolling Chassis Consisting of a Frame With Suspension and Powertrain Components

On July 16, 2024, Commerce published notice of the initiation of antidumping and countervailing duty investigations into low-speed transportation vehicles (LSPTVs) from China. *Certain Low-Speed Transportation Vehicles from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 57,870 (Dep't Com. July 16, 2024); *Certain Low-Speed Transportation Vehicles from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 57,865 (Dep't Com. July 16, 2024). The petition that prompted these investigations was submitted by the American Personal Transportation Vehicle Manufacturers Coalition, which is made up of Club Car, LLC and Textron Specialized Vehicles Inc. (which does business as E-Z-Go). 89 Fed. Reg. at 57,865 n.1. Each of these "domestic" manufacturers has been reported to "assemble golf carts in the United States" using components sourced from China and Vietnam, among other countries. Lori Ann LaRocco, *President Trump's trade war hits his second-favorite set of wheels, the golf cart*, CNBC, https://www.cnbc.com/2025/04/30/tariffs-target-trumps-second-favorite-set-of-wheels-the-golf-cart.html (last updated May 5, 2025 12:46 PM EDT).

The scope of the antidumping and countervailing duty investigations, as described at initiation, covered "certain [LSPTVs] and subassemblies thereof, whether finished or unfinished and whether assembled or unassembled …." 89 Fed. Reg. at 57,869. "An unfinished and/or unassembled LSPTV subject to" the investigations "covers *at a minimum* a subassembly, also

known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame or body *with* front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) *installed and* powertrain components (including either an electric motor or a gas-powered internal combustion engine) *installed or ready for installation.*" *Id.* (emphasis added). Other parts "imported together with a [subject] rolling chassis" are also covered by the investigations. *Id.* at 57,869-70. Furthermore, subject subassemblies "include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope." *Id.* at 57,870.

As the Coalition put it:



"As detailed in the scope, *the defined 'rolling chassis' is the minimum subassembly required for a product to be covered by the scope of these investigations*." Letter from R. DeFrancesco, III to Hon. G. Raimondo and Hon. L. Barton re: Certain Low Speed Personal Transportation Vehicles from the People's Republic of China: Petitioner's Response to First Supplement Questionnaire Regarding Common Issues and Injury Volume I of the Petition, Inv. Nos. A-570-176 and C-570-177, at 9 (June 28, 2024) (Barcode 4586604-01) (emphasis added) (including the above picture

of a rolling chassis with wheels). The "individual parts or components that comprise the rolling chassis subassembly … *must be imported together as the rolling chassis*, whether assembled together or as part of a kit," to "be considered covered merchandise." *Id.* at 9-10. Accordingly, the "minimum amount of assembly required for a structure to be considered a subject subassembly is that required to construct the subject rolling chassis subassembly," with "[f]ront and/or rear suspension components … installed onto the frame or body" and "[p]owertrain components … installed or provided ready for installation …." *Id.* at 11.

In December 2024 and January 2025, Commerce then published its preliminary affirmative antidumping duty, countervailing duty, and critical circumstances determinations. *Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 96,942 (Dep't Com. Dec. 6, 2024); *Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Determination of Sale at Less-Than-Fair-Value Investigation, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8517 (Dep't Com. Jan. 30, 2025). These preliminary determinations imposed a combined cash-deposit rate of approximately 270 percent *ad valorem* for certain exporter and producer combinations, and 500 percent *ad valorem* for most others. 89 Fed. Reg. at 96,943; 90 Fed. Reg. at 8518.

On August 12, 2025, Commerce published its final antidumping and countervailing duty determinations and orders. *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping*

*Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (the "*LSPTV Orders*"). The scope of the *LSPTV Orders*, as is relevant here, did not change from Commerce's notices of initiation, except that certain parts entered with subject rolling chassis, or imported to be assembled with subject rolling chassis, were included within the final scope and required a certification if not:

> The merchandise covered by these orders consists of certain low speed personal transportation vehicles (LSPTVs) and subassemblies thereof, whether finished or unfinished and whether assembled or unassembled, with or without tires, wheels, seats, steering columns and steering wheels, canopies, roofs, or batteries. ….
>
> An unfinished and/or unassembled LSPTV subject to these orders covers at a minimum a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope.
>
> Subject LSPTVs and subassemblies are covered by the scope of these orders whether or not they are accompanied by other parts. These orders covers *[sic]* all LSPTVs and subassemblies meeting the physical description of the scope, regardless of overall length, width, or height. The following individual components of Chinese origin that are entered by themselves on separate bills of lading ( *i.e.,* not on the same bills of lading as Chinese-origin subject subassemblies/rolling chassis) are not subject to these orders when accompanied by the appropriate certification: seat assemblies, steering columns, suspension systems, plastic cowlings, and electric and gas-powered motors suitable for use in LSPTV *[sic]*. When entered with ( *i.e.,* on the same bill of lading as) a Chinese-origin LSPTV or subject rolling chassis, whether finished or unfinished and whether assembled or

> unassembled, or when entered without the appropriate certification, these components are covered merchandise.
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

*LSPTV Orders*, at 38,763. The *LSPTV Orders* increased the combined cash deposit rate to approximately 333 percent *ad valorem* for certain exporter and producer combinations, and about 519 percent *ad valorem* for most others. *LSPTV Orders*, at 38,761-62.

The relevant portion of the certification provides as follows:

> (i) I certify that the parts (*i.e.*, Chinese-origin seat assemblies, steering column assemblies, suspension systems, plastic cowlings, or motors) that I am importing are not being imported together *with subject subassemblies (i.e., rolling chassis) or subject unfinished LSPTVs*. Imported together means on the same bill of lading. … A subassembly (*i.e.*, rolling chassis) is subject to the Order if it meets the definition of a rolling chassis as described by the scope of this order.
>
> (ii) I also certify that neither my company nor a related entity will assemble these parts *with a subject subassembly or a subject unfinished LSPTV* to produce an LSPTV….

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536, 26,539 (Dep't Com. June 23, 2025) (emphasis added). This certification is required only for entries made on or after June 23, 2025. *Id.* at 26,538.

## II. <u>ICON Imports Goods Lacking Chinese-Origin Rolling Chassis</u>

ICON is a Florida-based importer of electric golf carts. While ICON originally imported these products from China, it has since shifted its sourcing to Vietnam. From the initiation of the EAPA investigation onward, and during most of the time period covered by the interim measures at issue, all of ICON's imports of carts have comprised frames produced in Vietnam. Prior to

Customs' imposition of interim measures, ICON communicated these facts to Customs and cooperated with all Customs' requests for information.

Before the imposition of the interim measures, Customs issued two CF-28 requests for information to ICON on June 17, 2025. The first, relating to Entry 3011 made on May 20, 2025, stated that the entry was "being reviewed" "by the [Automotive and Aerospace] Center," and requested standard import documentation such as the commercial invoice, packing list, bill of lading, and descriptive literature, as well as the "[m]ethodology used for classification." C.R.2, CR000006-7. The second CF-28, relating to Entry 2500 made on April 22, 2025, stated that Customs "is currently performing a review of this entry," and requested third-party records of production and raw materials, among other things, in addition to the items requested by the first CF-28. C.R.1, CR000002-03. Neither of the CF-28s mentioned the antidumping and countervailing duty investigations or asked why the carts contained in the entries were not subject to the antidumping and countervailing duty investigations. C.R.1 & 2, CR000002-7.

ICON provided a combined response to these two requests on July 23, 2025. C.R.11, CR000463-528. These two entries were of unfinished "i-series model carts" imported as "body kits." CR000463-4. As ICON described to Customs, "**[[**

**]]**." CR000464. ICON supplied a bill of materials, images of the body kits as imported, specification sheets for completed carts, and additional relevant images as exhibits to its response, *see id.*, and also detailed its classification methodology under the Harmonized Tariff Schedule of the United States, *see* CR000464-7.

ICON also volunteered that the body kits were not subject to the antidumping or countervailing duty investigations. Specifically, although the body kits imported into the United States contained Chinese-origin frames,[1] they lacked suspensions and powertrain components. CR000467-8. As such, they did not constitute subject rolling chassis. CR000467-8. The record does not reflect any follow-up from Customs regarding these entries, the CF-28s, or ICON's response. At no point before the interim measures were imposed did Customs suggest that ICON's response to these CF-28s was lacking.

Customs then issued another CF-28 request for information to ICON on July 24, 2025. This CF-28, relating to Entry 3185 (and other entries) made on June 12, 2025, stated that the entries were "being reviewed by the [Automative and Aerospace] Center." C.R.3, CR000011-2. This CF-28 requested standard import documentation, "[a]ll documents related to ordering/purchasing," and documentation showing that "these golf carts and sub-assemblies are made in Vietnam," including detail as to "the substantial transformation that takes place in Vietnam." *Id*. The CF-28 did not, however, ask ICON to explain why the carts in the entries were not subject to the antidumping and countervailing duty investigations. *Id*. With Customs' agreement, ICON responded as to Entry 3185 on October 31, 2025. C.R.11, CR000529-35.

ICON's response as to Entry 3185 explained that the entry contained **[[**

]**]**. CR000530. These carts were declared as

**[[**

---

[1] To be clear, ICON's motion for a temporary restraining order and preliminary injunction focused on models of carts imported by Marxon between October 2025 and March 2026 and by ICON in March 2026, which contain Vietnamese-origin frames and represent the vast majority of entries affected by the challenged interim measures. *See* ECF No. 5-1 ¶¶ 2-3. Entries made before June 10, 2025, could not be impacted by the challenged interim measures. *See infra* n.7. And ICON conceded that only carts from mid-2025 onward contained Vietnamese-origin frames. *See* ECF No. 5-1 ¶ 10.

**]]**. CR000531-2. Historically, ICON explained, it **[[**

**]]**. CR000531. At the time of production of the carts in Entry 3185 in April 2025, there were **[[**

]]. *Id*. Since then, ICON explained, **[[**

**]]**. *Id*. The response argued that Vietnam was the correct country of origin of the carts, and attached voluminous records relating to entry, purchase, export from Vietnam, and production in Vietnam (including production records, a bill of materials, and supplier documents from major Vietnamese suppliers). CR000532-5; *see* C.R.11-14, CR000536-1866. But the response did not address whether the carts were subject to antidumping or countervailing duties.

Subsequently, on November 25, 2025, a Customs import specialist on the Automotive and Aerospace Center's "ADCVD Team" reverted the entry back to a type 01 entry from type 03. C.R.14, CR001881. As the import specialist correctly noted, **[[**

**]]** *Id*. About two weeks later, ICON's new importer of record explained in a separate CF-28 response that the **[[**

]].

CR001897. Regardless, ICON worked to collect the requested information. *See* CR001868-76.

But rather than wait for ICON's response, Customs reached its reasonable-suspicion determination on March 30, 2026, and imposed the interim measures. ICON responded anyway on April 7, 2026, that **[[**

**]]**. C.R.14, CR001868. Specifically, to produce the carts at issue in Entry 3185, the **[[**

**]]**. *Id.*; *see* CR001874-5 (March 24, 2025 pictures of these bare frames).

Finally, on November 6, 2025, Customs issued a CF-28 to Marxon Energy Inc., C.R.5, CR000220, which—between October 2025 and March 2026—served as ICON's importer of record. The CF-28 concerned Entry 6855, among others, made on October 31, 2025, and requested standard import documentation; a "factory profile" of ICON's Vietnamese manufacturer **[[** **]]** including production records, photographs, export documentation, "other relevant documents," and an explanation of both when production "began with raw materials sourced from Vietnam," and what "specific parts are still [being] manufactured with raw materials from China." *Id*. Once more, the CF-28 did not ask about the *LSPTV Orders* or mention EAPA. Nor did the CF-28 ask about Marxon's relationship with ICON.

Marxon responded on March 10, 2026, attaching entry documents, product descriptions and images, purchase records, export records, production records, a bill of materials, and a site visit report, among other documents. C.R. 15, CR001890-4. The response indicated that the carts at issue, ICON's **[[**

]]. CR001891. Just as ICON consistently explained in its CF-28 responses, Marxon explained that, after the "initiation of the antidumping and countervailing duty investigations on" LSPTVs from China, **[[** ]]. CR001892. Because of these efforts, by June 2025, ICON's carts contained **[[** ]]. CR001893. Specifically, as evidenced by production records included with the CF-28 response, CR002136-57, CR002244-53, **[[**

]]. CR001893. The response continued that the carts were not subject to antidumping or countervailing duties because the carts **[[**

]]. CR001897. And at least one Customs import specialist was provided a **[[** ]] of **[[** ]] Vietnamese factory. CR001880.

### III. The Coalition Files an EAPA Allegation Against ICON that Misconstrues the *LSPTV Orders* and Relies on Stale, Innocuous Evidence

On October 10, 2025, the Coalition filed its EAPA allegation requesting that Customs investigate ICON for suspected evasion of the *LSPTV Orders*. C.R.4, CR000015-41. The allegation concedes that subassemblies must have "the minimum characteristics of a 'rolling chassis'" to be covered by the *LSPTV Orders*—suspension *and* powertrain components included. CR000025. The allegation also concedes that parts "intended to be … assembled together *with Chinese-origin subassemblies* after importation" are "part of the scope," and thus importers that import certain parts on separate bills of lading must certify "that neither they, nor a related entity, will assemble these parts *with a subject subassembly or a subject unfinished LSPTV* to produce an

LSPTV." CR000026-7 (emphasis added) (quotation omitted). Yet despite these concessions, the allegation then incorrectly claims that all Chinese-origin "LSPTV components and parts that are intended for assembly into LSPTV are within the scope of the Orders," including entries of "spare part[s]." CR000028.

The Coalition's allegation of evasion rests largely on this misconstruction of the *LSPTV Orders*. The allegation states that "[s]ince July 2018, ICON has imported over 50,000 MT of goods classified under HTSUS code 8703.10, which corresponds to LSPTVs," and its "top suppliers" (over some unstated period of time) were certain Chinese manufacturers. CR000030. In "July 2025," an investigator hired by the Coalition **[[**

**]]** CR000031. The allegation notes that ICON had advertised for "Warehouse Assembly Worker" positions at that facility, involving entry level "golf cart assembly" work. *Id.* **[[**

**]]**[2]

The allegation claims that the Coalition's investigator **[[**

[2] **[[**

**]]**

**]]**

The Coalition's investigator then apparently determined that **[[**

**]]** contained "approximately 77 MT suspension shocks, wheel assemblies, AC motors, hydraulic oil, and other suspension accessories." *Id.* But the investigator's report actually states "other accessories," CR000060—not other *suspension* accessories, as the Coalition claimed in its allegation, CR000033. After making this misstatement, the allegation claims that all these parts must be "covered by the Orders." CR000033. But those parts constituting "seat assemblies, steering column assemblies, suspension systems, plastic cowlings, or motors" could theoretically be subject to the *LSPTV Orders* only if assembled post-importation with a *Chinese-origin subassembly*—*i.e.*, a vehicle frame or body with suspension and powertrain components. CR0001834. And evidence of assembly at ICON's facility in Florida (or elsewhere, CR000033) with imported parts—even if they are motors or suspension parts—does not constitute evidence of imported Chinese-origin subassemblies.[3]

The allegation also cites **[[**

[3] Indeed, Club Car is reported to import "*motors* …, brakes, clutches, and parts from China" to build its golf carts. Lori Ann LaRocco, *President Trump's trade war hits his second-favorite set of wheels, the golf cart*, CNBC, https://www.cnbc.com/2025/04/30/tariffs-target-trumps-second-favorite-set-of-wheels-the-golf-cart.html (last updated May 5, 2025 12:46 PM EDT) (emphasis added).

**]]**

The allegation then turns to **[[**

**]]** No effort was made to explain whether any shipments of more than just spare parts occurred after Commerce's critical circumstances determinations in December 2024 and January 2025.[4] The Coalition's allegation, however, asserts anyway that the products imported between October 1, 2024 and January 18, 2025 "included LSPTV chassis and associated components that are within the scope of the Orders." CR000035.

The investigator then notes that **[[**

**]]** *Id*. Yet the allegation claims that "it is clear that ICON is importing the subparts to a rolling chassis and other components *together* with intent to assemble those parts in the United States and make LSPTVs," CR000035 (emphasis added)—even

[4] While subject imports made during the critical circumstances period are subject to antidumping and countervailing duties, such products were properly imported as type 01 entries at the time of entry and could therefore not be the basis for an affirmative evasion finding.

though the investigator stated **[[**

**]]**

Finally, the allegation concludes by observing that ICON must not have been paying cash deposits, given its statements to customers and pricing. CR000036-8. The Coalition supplemented its allegation on December 8, 2025, with an additional statement ICON made to its customers about tariffs. C.R.6, CR000226-32. But the Coalition provided no evidence of ICON's import activity past March 2025, and its investigator's **[[**

**]]**[5]

## IV. Customs Initiates its Investigation Based Largely on the Coalition's Allegation

On December 30, 2025—well over 15 business days after the Coalition submitted its allegation, *see* 19 U.S.C. §1517(b)(1)—Customs formally initiated its EAPA investigation into ICON, Marxon, and other LSPTV importers. C.R.9, CR000445-53. Customs' initiation memorandum relies almost entirely on the Coalition's allegation.

The memorandum begins by summarizing the Coalition's allegation: "[t]he Coalition claims that since the beginning of 2025, ICON has shifted from importing complete vehicles to importing LSPTVs in parts to avoid duties following the initiation of AD/CVD investigations." CR000447. But the memorandum, like the allegation, misconstrues the *LSPTV Orders*. It states that the "covered merchandise under the *Orders* includes LSPTVs and their subassemblies, *particularly* rolling chassis, whether finished or unfinished, assembled or unassembled." CR000446 (emphasis added). And it continues that "individual Chinese-origin LSPTV components entered on a separate bill of lading and imported to assemble finished vehicle *[sic]*

[5] The allegation also appears to have deliberately waived attorney-client privilege over the Coalition's communications with its counsel. *See* C.R.4, CR000191, CR000202-5.

**This Page Contains Confidential Information**

are covered by the *Orders*, such as seat assemblies, steering columns, suspension systems, plastic cowlings, and electric or gas powered motors, unless accompanied by the" required certification. CR000446-7. But as explained above, the *LSPTV Orders* provide that the "minimum" requirement is a Chinese-origin rolling chassis, consisting of a frame with suspension and powertrain components. *LSPTV Orders*, at 38,763. And if Chinese-origin parts are not entered or assembled with a Chinese-origin rolling chassis, they are not subject to the *LSPTV Orders*.

The memorandum then recounts some of the points discussed in the Coalition's allegation. For example, the memorandum notes that ICON had warehousing and assembly facilities in the United States where separate parts were observed in July 2025, and further notes that, according to bill of lading data, ICON was recently importing "frames and suspension components … separately." C.R.9, CR000447-8.[6] Once more, that frames, suspension components, and powertrain components were being imported separately shows that no subject rolling chassis were imported under the plain language of the scope of the *LSPTV Orders*.

Finally, the memorandum explains that, according to "ICON's trade data in CBP data systems, for certain entries ICON was the consignee for importer Marxon," including current entries. C.R.9, CR000448-9. The memorandum, however, did not provide any analysis as to how Marxon entries might have included subject rolling chassis. It simply stated that an "importer" may be "the consignee" under 19 C.F.R. §101.1, that the allegations "reasonably suggest an evasion scheme" (without identifying any evidence of such a scheme), and that Customs was therefore initiating an EAPA investigation against both ICON and Marxon. *Id.*

[6] The memorandum also relies on the June 12, 2025 dealer declaration attached to the allegation, C.R.9, CR000448, but as noted above, **[[**

**]]**

At no point does the initiation memorandum discuss any of ICON's CF-28 responses or communications with Customs in which ICON consistently and transparently explained what it was importing from where. *See* C.R.9. An internal email circulating the initiation memorandum among Customs personnel in fact confirms that at no point before deciding to initiate the investigation did Customs reach out to ICON's assigned import specialist. The email, dated December 30, 2025, asks the Office of Field Operations to "[p]lease identify the point(s) of contact at the Center responsible for the importer(s) ICON EV LLC" and "Marxon Energy Inc[.]" C.R.10, CR000456. Only after identifying these points of contact did Customs apparently "hold a kick-off meeting to discuss the case and initial investigative steps[.]" *Id.*

### V. Customs Provides Notice of the EAPA Investigation and at the Same Time Imposes the Interim Measures

On March 30, 2026, Customs provided notice by email of the EAPA investigation against ICON and Marxon. ECF No. 5-2. The email further stated that interim measures would be imposed, including extending and suspending liquidation of certain entries. *Id.* Importantly, Customs also decided to impose discretionary interim measures under 19 U.S.C. §1517(e)(3); specifically, Customs required "live entry" for "all imports of LSPTV from China and Vietnam," rejection and refiling of entry summaries that were within the rejection window,[7] and the payment of cash deposits at the "all others" rate "on LSPTV and parts" (a combined rate of 519.23 percent *ad valorem*) unless a separate rate applies. *Id.*

[7] Customs claims the authority to reject "Antidumping and Countervailing Duty … entry summaries" filed up to 300 days ago. CSMS #66200760 (Sept. 11, 2025 10:16 AM EDT). This would permit Customs to require entry rejection, refiling, and live entry as to entries made as far back as June 10, 2025, assuming the interim measures took effect on April 6, 2026, the date of the Notice.

Customs followed up a week later with its formal Notice of Initiation (Notice), ECF No. 24-2, that provided its reasoning and imposed interim measures. Customs began by acknowledging that ICON had shifted its supply chain "to Vietnam after Commerce issued its preliminary determination," then discussed the CF-28 responses. Notice 11.

First, Customs discussed the CF-28 response for Entries 2500 and 3011, which were made in April and May 2025. Notice 11. Recall that these entries were of "body kits"—Chinese frames lacking powertrain components or installed suspensions—and that Customs never followed up on ICON's response. ICON explained in its combined response that the origin of the kits was China, even though they were assembled in Vietnam, but that the kits were not subject to the *LSPTV Orders* because they did not constitute rolling chassis. C.R.11, CR000463-8. Yet Customs missed the point. It faulted ICON for acknowledging that the kits were Chinese origin. Notice 11-12 ("Notably, for Entry 2500, China was listed as the country of origin for certain components imported from Vietnam…. Additionally, the BOM was written in Mandarin with English translation, further suggesting that these materials are of Chinese origin[.]"). It then criticized ICON for "fail[ing] to provide sufficient explanation for the materials used to produce LSPTVs or in the assembly of golf carts." Notice 11. But Customs did not explain why ICON would have to provide an explanation of materials not included within an entry.

Customs' main issue with these entries was that certain items listed in the bill of materials for the kits, including **[[** **]]** "appear[ed] to be **[[** **]]**." Notice 11. "Because ICON provided no further clarification on how these materials are used in the assembly of LSPTVs, it is difficult for CBP to assess the veracity of ICON's claim regarding the absence of **[[** **]]**." Notice 11-12. The problem, of course, is

that the record is devoid of evidence that Customs ever asked ICON to clarify or supplement its response because it was deficient in some way.

Regardless, despite these components being listed in the bill of materials, the pictures included in the CF-28 response show that the body kits lack installed suspensions. C.R.11, CR000511-20 (depicting the body kits, which lack front or rear suspensions). Moreover, because a subject rolling chassis must have powertrain components, the presence of a **[[**

**]]** still would not matter. Even if all these components constituted an installed suspension (and they do not), the bill of materials still lacks any *powertrain* components, as Customs did not dispute.

Customs then turned to ICON's CF-28 response for Entry 3185, made on June 12, 2025. Recall that this entry contained carts with a Chinese bare frame that was assembled in Vietnam with Vietnamese and Chinese parts. CR000529-35. ICON's assigned Customs import specialist communicated with ICON over the course of several months about this CF-28 response, explaining (correctly) that **[[**

**]]** C.R.14, CR001881. And the Chinese frame, as ICON confirmed both before and after the Notice issued, was **[[**

**]]**. C.R.15, CR001897; C.R.14, CR001868 (explaining that the **[[**

**]]**).

In its Notice, however, Customs took issue with "key components" like the **[[**

**]]** being Chinese-origin, and complained it was unclear if **[[**

**]]**. Notice 12 (also noting that certain Vietnamese suppliers did not "appear[] to provide" key "components necessary for golf cart assembly" and that it was "unclear whether" a **[[** **]]** of components had been implemented). These complaints make little sense given that ICON explained to Customs, both in the CF-28 response and through follow-up communications, that the bare frame was Chinese-origin and shipped separately from suspension and powertrain components to Vietnam. C.R.15, CR001897; C.R.14, CR001868. Indeed, Customs' import specialist reviewing ICON's CF-28 response agreed that **[[** **]]** C.R.14, CR001881.

Additionally, Customs claimed that "production records [were] inadequate" because they "mainly" contained "general log entries" without "specifying methods or procedures[.]" Notice 12. But again, despite Customs being in regular communication with ICON concerning this CF-28 response, not once did it suggest that the production records were inadequate. This is because the records *were* adequate. For example, a production flowchart specifies the exact methods and procedures used in Vietnam to produce LSPTVs using Chinese bare frames, including narrative descriptions and pictures of equipment used, from drilling the frame to installing suspension and powertrain components. C.R.11, CR000969-85. The "Assembly Department Daily Report" further provides confirmation that these production steps were undertaken for specific production orders, and references the steps detailed in the production flowchart through shorthand descriptions like "[c]hassis [a]ssembly" and "[e]lectrical [c]omponents [i]nstallation." CR000890-905. Chassis assembly, and particularly suspension installation, would not be necessary if what left China and entered Vietnam was a subject rolling chassis.

Finally, Customs discussed Marxon and its response to the CF-28 issued for Entry 6855, made on October 31, 2025. The Notice confusingly begins by stating that "[i]n its CF-28 response for Entry 6855, ICON did not provide any explanation regarding its decision to switch to Marxon." Notice 13. The CF-28, however, was issued to Marxon, and did not ask for any explanation as to why Marxon became ICON's importer of record. C.R.5, CR000220-2. Moreover, the Notice correctly explains in a footnote that "[t]he change from ICON as the IOR to Marxon as the IOR was due to CBP rate advancing most of ICON's entries and ICON's inability to secure a bond." Notice 13 n.117. In other words, Customs chastised ICON for not providing information that was never requested from Marxon and that was provided to Customs anyway.

The Notice then discusses the substance of the CF-28 response. The entries at issue, Marxon explained, contained carts assembled in Vietnam with Vietnamese-origin frames. But although "Marxon provided a production flow chart for" the "production process" undertaken by **[[ ]]** in Vietnam, Customs complained, it "did not specify how and from where the **[[ ]]** was sourced." Notice 13. "The BOM simply stated the **[[ ]]** was sourced from Vietnam, without naming suppliers or providing purchase records, despite CBP requesting this information in the Importers' CF-28 request." *Id.* "Assembly reports consisted primarily of log entries" that did not "specify[] methods or procedures that could substantiate the capability in these types of assembly." *Id.* "The **[[ ]]** report also lacked detail on **[[ ]]**." *Id.* "The production flow chart explained assembly steps but did not detail where components were manufactured or how they were sourced." *Id.*

Customs apparently misunderstood Marxon's CF-28 response. The frames *were made by* **[ ]**, as should have been obvious from response and its attached documentation. Specifically, a "Frame Welding Daily Production Report," "Frame Welding and Polishing Daily

Report," "Production Flow Chart," and "Frame Production Flow Chart" were included with the response, among other documents. C.R.15, CR002120. The frame welding production reports, which are written in Vietnamese, detail the **[[ ]]** employees who welded frames that were contained in the carts at issue, listing their names, ID numbers, stations, and work hours. CR002136-57. And the frame production flow chart, also in Vietnamese, provides a narrative and pictorial description of the machines and processes used to create frames in Vietnam from raw steel—*i.e.*, the "methods" and "procedures" that Customs thought lacking—including **[[**

**]]** CR002244-53. This is also how the Coalition describes the frame production process. C.R.4, CR000023-4. Customs' claim that the CF-28 response did not explain sufficiently where the frames were coming from is thus belied by the record. Moreover, Customs' Notice conveniently fails to mention that ICON's assigned import specialist was provided **[[ ]]**. C.R.14, CR001880.

Based on these purported "deficiencies" in the CF-28 responses, as well as the items mentioned in the initiation memorandum (*e.g.*, imports of separate parts), Customs determined that it had "reasonable suspicion that ICON and Marxon have engaged in transshipment of LSPTVs through Vietnam." Notice 11-14.

## VI. The Court Enjoins Certain Interim Measures due to Customs' Failure to Provide ICON Due Process

One week after Customs issued its Notice, ICON filed this action and sought a TRO and preliminary injunction preventing Customs from enforcing the interim measures imposed under 19 U.S.C. §1517(e)(3). ECF Nos. 1, 4, 5. The complaint raises three claims: first, that Customs violated Fifth Amendment due process by imposing these interim measures without notice or an

opportunity to be heard (Count One); second, that the reasonable-suspicion standard, as applied, violated Fifth Amendment due process (Count Two); and third, that Customs lacked reasonable suspicion of evasion (Count Three). ECF No. 4. In its motion for a TRO and preliminary injunction, supported by declarations and financial statements, ICON explained that these interim measures required the immediate payment of millions of dollars on merchandise already imported, and would put it out of business within a month if not enjoined. *See generally* ECF No. 5. The government opposed ICON's motion and moved to dismiss for lack of jurisdiction. ECF No. 24. The Coalition filed a short motion to intervene. ECF No. 18.

The Court heard testimony and argument at a closed hearing on April 23, 2026, after which it granted ICON's motion for a temporary restraining order. ECF No. 37. The Court then denied the Coalition's motion to intervene without prejudice, affording it the opportunity to later renew its motion for permissive intervention, ECF No. 39, and issued an opinion granting ICON preliminary injunctive relief against the interim measures unless a meaningful hearing were held within a week. *ICON EV LLC v. United States*, 836 F.Supp.3d 1361 (CIT 2026) (*ICON I*). The Court found that it likely had subject matter jurisdiction, that ICON would suffer irreparable harm absent relief, that the balance of equities and public interest favored ICON, and that ICON was likely to succeed on the merits of its claim that imposing the interim measures without notice or a meaningful opportunity to be heard violated due process. *Id.* at 1370-74.

Through the motion-to-dismiss briefing, the government confirmed that it declined to offer ICON a hearing. ECF No. 43 at 2. The Court later confirmed that it had jurisdiction to entertain all three of ICON's claims. *ICON EV LLC v. United States*, --- F.Supp.3d ---, 2026 WL 1470148 (CIT May 26, 2026) (*ICON II*).

The Coalition then renewed its motion for permissive intervention, providing the explanation and argument that was missing from its first motion. *Compare* ECF No. 55 *with* ECF No. 18. ICON opposed the Coalition's renewed motion. ECF No. 61. The Court partially granted the Coalition permissive intervention, permitting the Coalition to defend Customs' reasonable-suspicion determination (Count Three) but precluding the Coalition from challenging ICON's constitutional claims (Counts One and Two). *ICON EV LLC v. United States*, --- F.Supp.3d ---, 2026 WL 2295795 (CIT Aug. 10, 2026) (*ICON III*).

## SUMMARY OF ARGUMENT

In granting a preliminary injunction, the Court concluded that Fifth Amendment due process likely required Customs to provide ICON notice and a meaningful opportunity to be heard before imposing the interim measures at issue. The law has not changed since then. Nor have the facts. The administrative record confirms that ICON received no pre-deprivation notice or meaningful opportunity to be heard. The Court should therefore grant ICON judgment on Count One of the complaint.

Customs also violated ICON's Fifth Amendment due process rights another way: by imposing the interim measures under too low of an evidentiary bar. For much the same reasons that Customs must afford notice and a meaningful opportunity to be heard before imposing these interim measures, Customs must also clear the bare minimum hurdle of proof by a preponderance of the evidence. The reasonable-suspicion standard invites too high a risk of error, subordinating ICON's substantial interests to hasty, underinformed decisionmaking where no exigency exists to justify it. ICON is thus entitled to judgment on Count Two of its complaint.

Finally, beyond these constitutional violations, Customs also violated 19 U.S.C. §1517(e) by imposing the interim measures without reasonable suspicion of evasion. The administrative

record shows that Customs' "reasonable suspicion" relied on a butchering of the scope of the *LSPTV Orders*. Under Customs' reading of the *LSPTV Orders*, even the "domestic" industry could be subject to an EAPA investigation due to Chinese-origin part imports. Moreover, Customs—in *post hoc* statements—largely relied on what it deemed to be "deficient" CF-28 responses to justify its reasonable-suspicion determination. But those responses consistently and transparently informed Customs that ICON was moving its supply chain from China to Vietnam, that the entries did not contain Chinese-origin rolling chassis, and that by at least July 2025 carts with Vietnamese-origin frames were being produced and imported by ICON. Regardless, at least one of the CF-28 responses that Customs relied on to justify the challenged interim measures was stale, as it related to entries outside the reach of the challenged interim measures. And those that were not demonstrated compliance with the *LSPTV Orders* rather than evasion—indeed, one of the CF-28s resulted in Customs reverting an entry from type 03 to type 01. There are thus two separate but related problems with Customs' determination: first, the evidence that Customs pointed to in its Notice failed to identify a reasonable basis for concluding that ICON had at any point entered covered merchandise; and second, Customs failed to articulate any reasonable suspicion that the entries to which the challenged interim measures apply actually contained covered merchandise. Therefore, ICON is entitled to judgment on Count Three of its complaint.

For any of these reasons, Customs violated the law in imposing the interim measures at issue, and the Court should grant judgment in ICON's favor.

## ARGUMENT

### I. Standard of Review

Because this action seeks review of an agency determination under 28 U.S.C. § 1581(i)(1)(D), the Court "shall review the matter as provided in section 706 of title 5." 28 U.S.C.

§ 2640(e). That section in turn provides "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right[.]" 5 U.S.C. § 706(2).[8]

## II. Customs Failed to Provide ICON Predeprivation Notice or a Meaningful Opportunity to be Heard, in Violation of the Fifth Amendment

The Court already found that Customs' decision to impose bankrupting interim measures—without any pre-deprivation notice or opportunity to be heard—likely violated ICON's right to due process. *ICON I*, at 1370-71. Nothing has changed since then. And the record confirms that ICON received neither notice nor an opportunity to be heard before Customs imposed the interim measures. Because Customs violated ICON's Fifth Amendment right to due process by failing to provide pre-deprivation notice and a meaningful opportunity to be heard, ICON is entitled to judgment on Count One of its complaint.

Start with the facts. None of the CF-28 requests for information issued to ICON, nor the CF-28 issued to Marxon after Customs had received the Coalition's allegation, nor any other pre-deprivation communication to either ICON or Marxon referenced any EAPA investigation, the interim measures at issue, or Customs' concerns articulated in its Notice. *See* C.R.1-3, 5; C.R.14, CR00001877-83. Indeed, the email circulating Customs' memorandum initiating the EAPA investigation confirms that, until the Notice issues, "EAPA investigations are NOT public and must NOT be disclosed to personnel outside of CBP (such as importers, brokers, counsel, *etc.*)." C.R.10,

[8] The government has not sought discovery as to any facts underlying jurisdiction and relief despite the opportunity to do so. ICON thus does not understand the government to be contesting any of the facts established through the preliminary-injunction proceeding. Nevertheless, to the extent necessary, ICON also moves for summary judgment in connection with these facts, which fall outside the scope of record review. *AM/NS Calvert LLC v. United States*, 654 F.Supp.3d 1324, 1339 n.13 (CIT 2023); *JSC Acron v. United States*, 893 F. Supp. 2d 1337, 1344 n.7 (CIT 2013).

CR000456. The government does not—and cannot—dispute that ICON was afforded no notice or meaningful opportunity to be heard before the interim measures were imposed. *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice must "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

Then consider the law. As the Court explained when granting ICON preliminary injunctive relief, the Fifth Amendment affords "an importer participating in an administrative proceeding," including an EAPA proceeding, the "procedural due process right to notice and a meaningful opportunity to be heard." *ICON I*, at 1370-71 (quoting *Superior Com. Sols., LLC v. United States*, 811 F.Supp.3d 1363, 1376 (CIT 2025)); *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (CAFC 2023). Due process generally requires the government to provide such notice and a meaningful opportunity to be heard before, not after, a deprivation occurs. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("some form of pretermination hearing" is generally required). "To determine whether due process has been provided, courts consider (1) the private interest at stake; (2) the risk of an erroneous deprivation through the procedures used and the probative value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *ICON I*, at 1370 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

For the same reasons the Court already found ICON was likely to succeed, the Fifth Amendment required Customs to provide ICON notice and a meaningful opportunity to be heard before requiring the immediate payment of millions of dollars on merchandise already imported.

*First*, as to the private interest at stake, ICON "has a legitimate property interest in the proper assessment of imports," *id.*, and the government has not suggested otherwise. Additionally,

as the Federal Circuit has acknowledged (and the government has previously agreed), "importers in antidumping proceedings are entitled to procedural due process." *Royal Brush,* 75 F.4th at 1257. These interests are heightened here, given the effect of the interim measures on ICON. "The combination of cash deposits for AD/CVD duties with the live entry requirement"—akin to "sanctions"—"requires the importer to suddenly deposit a large amount of cash with Customs before it can even complete the sale for which it is importing the goods." *Phoenix Metal Co. v. United States*, 2024 WL 2891503, at *9 (CIT June 10, 2024) (citation omitted). The imposition of these measures "for any appreciable time works a uniquely final deprivation." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978). And although duties may later be refunded, ICON lacks any realistic ability "to ameliorate the interim loss," *Mathews*, 424 U.S. at 341, because it will be put out of business before a refund could do any good. *See, e.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (a "favorable final judgment might well be useless" for a company facing imminent bankruptcy).

*Second*, the high risk of erroneous deprivation necessitates notice and a meaningful opportunity to be heard. As the Court recognized, "Customs relied primarily on ICON's responses to information requests that it sent before initiating its investigation" to justify its reasonable-suspicion determination. *ICON I*, at 1371. But Customs "provided no opportunity for ICON to supplement or explain its responses" that Customs claimed were deficient before imposing the interim measures. *Id.* Such an opportunity would have allowed ICON to explain why Customs was wrong to conclude that the imports upon which these interim measures were imposed may have been "covered merchandise."

For example, at least some of the information that Customs relied on to determine that entries covered by the interim measures were covered merchandise was stale. As ICON

consistently and transparently explained to Customs, ICON worked as quickly as it could to shift its supply chain from China to Vietnam to comply with the *LSPTV Orders*. To this effect, it began sourcing golf carts with Vietnamese frames in mid-2025. C.R.11, CR000464, CR000468; C.R.15, CR001892. Customs thus knew that ICON was rapidly shifting production yet relied on outdated information, like entries occurring before June 10, 2025—the earliest possible entry date to which the challenged interim measures could reach back. "[I]ncomplete and stale" information, however, does not support reasonable suspicion. *United States v. Jones*, 619 F.2d 494, 498 (CA5 1980); *cf. Sgro v. United States*, 287 U.S. 206, 210 (1932) ("[T]he proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.").

Affording notice and an opportunity to be heard also would have allowed ICON to correct Customs' misreading of the *LSPTV Orders* and to provide whatever additional information was needed. "[T]he *LSPTV Orders* quite clearly state that a rolling chassis, at a minimum, consists of a frame *with* suspension and powertrain components." *ICON I*, at 1371. Moreover, "suspension systems" and "other components shipped on a separate bill of lading from a rolling chassis are not covered" by the *LSPTV Orders*. *Id.* Customs' Notice, however, focuses on old import activity concerning non-subject parts. The Notice also faults ICON for providing purportedly "incomplete" responses to the CF-28s. For instance, with respect to the CF-28 concerning Marxon's entries of carts, the Notice claimed that it was "unclear whether" a "**[[** **]]**" was "implemented," and questioned whether ICON's Vietnamese suppliers could "provide components necessary for golf cart assembly" other than frames, Notice 12. Yet the CF-28 response provided documentation **[[** **]]** showing that the frames were made in Vietnam. If Customs had a better evidentiary and legal picture, rather than one-sided allegations submitted by ICON's competitors and CF-28 requests

issued *before* Customs initiated its investigation, it may well have reached a different conclusion as to reasonable suspicion or the propriety of the interim measures.

On the last point, as the Court also recognized, "Customs has discretion not to impose all interim measures" under 19 U.S.C. § 1517(e)(3). *ICON I*, at 1374. "Even where the facts are clear, the appropriateness or necessity of [adverse agency action] may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the [action] takes effect." *Loudermill*, 470 U.S. at 543. Thus, even if it were undisputed that the *LSPTV Orders* covered all the entries of carts at issue in the CF-28 responses—and it is not—the only meaningful opportunity that ICON could have to argue that Customs should tailor its remedy to the "strength or weakness of [its] suspicion," *ICON I*, at 1374, particularly as to more recent entries, would be a pre-deprivation hearing. "The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one." *Loudermill*, 470 U.S. at 543 n.8. "At least the [agency] will be alerted to the existence of disputes about facts and arguments about cause and effect," which will inform its discretion and could "substantially reduce[]" the "risk of error" *Id.* (quotation omitted).

*Third*, the public interest supports requiring notice and an opportunity to be heard before imposing the interim measures. *See Mathews*, 424 U.S. at 347-48. Customs sat on the EAPA allegation at issue for two and a half months before initiating its investigation, then waited another three months before imposing the interim measures. In the six months it took for Customs to act, it could have provided ICON a meaningful opportunity to rebut the allegation, supplement its CF-28 responses, or provide additional facts or argument as to why the interim measures should not be imposed—all while complying with 19 U.S.C. §1517's timelines. Nor has the government suggested that providing such an opportunity to importers before interim measures are imposed

would cause any fiscal or administrative burdens. It may well *lighten* the government's burdens by "enhanc[ing] the reliability of information and the impartiality of the decisionmaking process," leading to "a less pressing need for individual suits to correct constitutional error." *Butz v. Economou*, 438 U.S. 478, 512 (1978); *see Vexas Corp. v. United States*, Consol. Court No. 26-03809 (CIT filed Aug. 28, 2026); *Star EV Corp. v. United States*, Court No. 26-03645 (CIT filed Aug. 14, 2026).

Accordingly, the *Mathews* factors, as well as this Court's prior decisions*, see ICON I*, at 1370-71; *Superior Com. Sols.*, 811 F. Supp. at 1376-77, demonstrate that Customs violated ICON's Fifth Amendment due process rights by depriving it of property before providing notice and a meaningful opportunity to be heard. The Court should therefore grant judgment in ICON's favor on Count One of its complaint.

## III. The Reasonable-Suspicion Standard, as Applied, Sets an Unconstitutionally Low Bar for the Imposition of the Challenged Interim Measures

In addition, Customs violated ICON's Fifth Amendment right to due process by imposing the interim measures at issue under too low of an evidentiary standard. To impose measures that would put an importer out of business before an evasion determination can be reached, the Constitution requires that Customs apply a preponderance-of-the-evidence standard—the default standard of proof for civil administrative proceedings.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quotation omitted). The more severe and permanent the deprivation, the higher the government's burden of proof. *Santosky v. Kramer*, 455 U.S. 745, 758 (1982). "Generally speaking," for civil proceedings involving money, the

"burden of proof is a mere preponderance of the evidence." *Addington*, 441 U.S. at 423. This "has long been recognized as the traditional burden of proof in civil administrative proceedings." *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1299 (CAFC 2021).

What evidentiary burden should be required for a particular proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. INS*, 385 U.S. 276, 284 (1966). And although 19 U.S.C. §1517(e) specifies a reasonable-suspicion standard of proof, this is immaterial. The "minimum requirements" of Fifth Amendment due process "are not diminished by the fact that" Congress specified "procedures that it may deem adequate for determining the preconditions to adverse official action." *Vitek v. Jones*, 445 U.S. 480, 491 (1980). The statute "neither removes" ICON's "interest from due process protection nor answers the question of what process is due under the Constitution." *Id.*

Applying the *Mathews* factors, the traditional preponderance-of-the-evidence standard is required when Customs imposes bankrupting interim measures. *See Addington*, 441 U.S. at 425 (applying *Mathews* to determine the appropriate evidentiary standard); *Santosky*, 455 U.S. at 757-70 (same). The reasonable-suspicion standard—which requires more than nothing, as discussed below—discounts ICON's significant interests while carrying too high a risk of erroneous deprivation. Customs cannot be permitted to pick and choose which companies go out of business using the same sort of "intuition" that permits brief stop-and-frisk detentions. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).[9]

[9] Neither Customs nor EAPA defines "reasonable suspicion." The weakness of the evidence cited and the language used in the Notice, however, strongly suggest that Customs applied a low bar akin to that endorsed in *Terry* and in *Am. Pac. Plywood, Inc. v. United States*, 2023 WL 4288346, at *9 (CIT June 22, 2023) (suggesting that only "slight evidence" or "very small amount" is needed for "reasonable suspicion"). *See, e.g.*, Notice 13 (pointing to "lack of clarity and supporting documentation" in CF-28 responses).

*First*, the private interest at stake is significant, as discussed above. *Mathews*, 424 U.S. at 335. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss." *Santosky*, 455 U.S. at 758 (quotation omitted). "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant *more than average certainty* on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Id.* (emphasis added). Here, the presumptive minimum of average certainty—proof by a preponderance of the evidence—is required, considering the nature and permanency of the loss that the interim measures would effect, as already discussed above. *See, e.g.*, *Phoenix*, 2024 WL 2891503, at *9.

*Second*, although the government has interests in protecting the revenue and enforcing antidumping and countervailing duty orders, those interests do not necessitate immediately putting an importer out of business based on supposition. Reasonable suspicion allows the government to investigate, suspend liquidation, and extend liquidation, all of which preserve its ability to collect whatever duties might be due without threatening the company's existence in the meantime. *See ICON I*, at 1374. And by the same token, allowing a company to continue operating and complete sales of imported goods *enhances* the government's ability to collect revenue. *See Phoenix Metal Co.*, 2024 WL 2891503, at *9; *see also Tate v. Short*, 401 U.S. 395, 399 (1971) (imprisoning indigent drivers who fail to pay fines "obviously" impedes, rather than serves, a state's interest in "augment[ing]" its "revenues"). Nor do the government's interests involve the sort of grave, imminent danger that courts have found permit a more relaxed evidentiary burden. *See*, *e.g.*, *Kashem v. Barr*, 941 F.3d 358, 381 (CA9 2019) (terrorism and commercial airline safety); *Sabey v. Butterfield*, 823 F.Supp.3d 113, 134 (D. Mass. 2026) (child abuse); *see also CEK Grp. LLC v. United States*, 633 F.Supp.3d 1369, 1374 n.1 (CIT 2023) (explaining that there are no "significant

factors of health and human safety present" in the EAPA context; "[i]nstead, CBP is tasked with enforcing U.S. antidumping and countervailing duty laws to protect U.S. industry, and deference is given in accordance with this goal"). The preponderance standard thus would not imperil the government's interests.

*Third*, the risk of erroneous deprivation based on a reasonable-suspicion standard is high. *Mathews*, 424 U.S. at 335. Customs initiates investigations based on allegations, typically submitted by interested parties like competitors, that "reasonably suggest[]" evasion. 19 U.S.C. §1517(b)(1). The reasonable-suspicion standard may not set the evidentiary bar any higher. *See ICON III*, 2026 WL 2295795, at *5 n.9 ("[H]ow the standard for the imposition of interim measures under section 1517(e) is different [from the standard under section 1517(b)] is unclear."). *But see* CR000023 ("Importantly, the standard for initiation is whether the evidence 'reasonably suggests' evasion, less than the 'reasonable suspicion' required for the imposition of interim measures ...."). Thus, under Customs' "reasonable suspicion" standard, Customs can initiate an EAPA investigation and mistakenly put a company out of business, without any opportunity for correction, based largely on the uninformed word of a competitor and a checklist. P.R.10, PR000410. By contrast, an evidentiary standard that requires finding evasion *likely*, rather than merely *possible*, would in turn require Customs to fairly balance both sides' evidence before deciding to impose interim measures requiring the immediate payment of many millions of dollars. *See Valmonte v. Bane*, 18 F.3d 992, 1004 (CA2 1994).

True, the reasonable-suspicion standard can be appropriate in some cases. Where a meaningful post-deprivation hearing can be held, a pre-deprivation hearing need only serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges … are true and support the proposed action."

*Loudermill*, 470 U.S. at 545-46. That standard maps well to Customs' actions that are unlikely to finally deprive a company of its property—investigating, suspending liquidation, and extending liquidation—before an EAPA investigation can conclude. *Cf. F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 241-42 (1980) (distinguishing between the issuance of an agency complaint lacking in "legal or practical effect" based on "reason to believe," and a "definitive" finding made after "further inquiry"). But it does not make sense for these interim measures. Post-deprivation process following the imposition of interim measures is meaningless to ICON because it will not exist to use that process. Nor could Customs realistically provide a meaningful post-deprivation hearing in the short amount of time between the interim measures' imposition and ICON's insolvency. *See Mullane*, 339 U.S. at 314. If Customs could, it presumably would have taken the Court up on its offer to provide "an appropriate hearing" within seven days. *ICON I*, at 1374.

In sum, as the Court observed, "Customs has discretion not to impose all interim measures. The strength or weakness of the suspicion likely should affect that decision." *Id.* Less severe interim measures may not require proof by a preponderance. But because these interim measures would effect a final deprivation, rather than merely suspend or extend liquidation, Fifth Amendment due process requires Customs to make its determination based on a preponderance of the evidence.[10] ICON is thus entitled to judgment on Count Two of its complaint.

[10] *Ninestar Corp. v. United States*, 687 F.Supp.3d 1308 (CIT 2024), supports this conclusion. There, the Court explained that "*Rodriguez*'s default rule fits well with more typical adjudicative proceedings that are generally bounded by due process concerns, such as veterans' benefits eligibility." *Ninestar*, 687 F.Supp.3d at 1335 n.21 (quoting *Rodriguez*, 8 F.4th at 1299). The administrative proceedings here are likewise bounded by due process concerns. *Royal Brush Mfg.*, 75 F. 4th at 1259. Moreover, for the same reasons, the "substantial evidence" standard required by 19 U.S.C. § 1517(c)(1)(A) is also unconstitutional. *See Rodriguez*, 8 F.4th at 1298 (explaining why "substantial evidence" is a standard of review, not factfinding). The Court, however, need not yet address this question.

## IV. Even if the Reasonable-Suspicion Standard Passed Constitutional Muster As-Applied, Customs Lacked the Reasonable Suspicion Necessary to Impose the Challenged Interim Measures

Finally, the record reveals that Customs lacked the reasonable suspicion of evasion necessary to impose the challenged interim measures. To start, what makes suspicion "reasonable" is necessarily context-dependent. As this Court has explained, the "Supreme Court has long held that the reasonable suspicion needed to initiate investigations, some of which are invasive enough as to potentially violate the Fourth Amendment, varies from statute to statute." *CEK Grp.*, 633 F.Supp.3d at 1374 n.1 (collecting cases). Here, the government's interest pales in comparison to the interests as stake in other contexts, like stop-and-frisk detentions, *see Terry*, 392 U.S. at 22-24 (discussing the need to detect and prevent knife and gun crime). The predicate legal questions involved can be complex—so complex, in fact, that EAPA instructs Customs to refer those questions to Commerce where appropriate, 19 U.S.C. §1517(b)(4).[11] And supply chains can change rapidly, particularly when antidumping and countervailing duty investigations arise—yet there is an entirely separate procedure for addressing whether these supply-chain changes are significant enough to shift a product out of the scope of an order, 19 U.S.C. §1677j. Again, this is a decision left to Commerce, not Customs.

Thus, even if Fifth Amendment due process does not require Customs to use the preponderance standard to impose the business-ending interim measures at issue—and it does—the reasonable-suspicion standard must still take context into account. Thus, for example, suspecting evasion based on the mere fact that an importer has entered merchandise that would

[11] As such, though police officers conducting traffic stops may have reasonable suspicion under the Fourth Amendment despite good faith mistakes of law, *Heien v. North Carolina*, 574 U.S. 54 (2014), the referral procedure mandated by 19 U.S.C. §1517(b)(4) makes clear that Customs must understand the scope of the orders at issue *before* making any determinations.

have been subject to an antidumping or countervailing duty order had it been made elsewhere, or based on an armchair circumvention guess, cannot be reasonable. Nor can imposing interim measures on imported merchandise that is not subject to an antidumping or countervailing duty order. Customs must instead look to the order at issue and apply its plain scope to the facts; if it has questions about scope, it is supposed to refer them to Commerce, rather than decide for itself.

With this context in mind, Customs' reasonable-suspicion determination came down to essentially two purported issues: imports of parts, and "deficient" CF-28 responses. Neither of these issues, whether considered separately or together, amounts to reasonable suspicion of evasion. And even if it somehow did, it still would not amount to reasonable suspicion that the entries of carts to which the interim measures apply actually contain covered merchandise.

To begin, Customs misconstrued the *LSPTV Orders*' scope in its Notice. As this Court explained, the *LSPTV Orders* "have a precise and limited scope." *ICON I*, at 1366. They cover certain Chinese-origin LSPTVs and "subassemblies thereof, whether finished or unfinished and whether assembled or unassembled." *Id.* (quoting *LSPTV Orders*, at 38,763). "An unfinished and/or unassembled LSPTV 'covers at a minimum a subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame or body' with installed suspension components and installed or installation-ready powertrain components." *Id.* (same). "The *LSPTV Orders* distinguish between Chinese-origin parts that are imported on the same bill of lading as a Chinese-origin rolling chassis—which are covered—and Chinese-origin parts that are imported on separate bills of lading—which are not covered," *id.*, so long as they are not assembled post-importation with Chinese-origin rolling chassis. Put simply, "the *LPSTV Orders* quite clearly state that a rolling chassis, at a minimum, consists of a frame *with* suspension and powertrain components." *Id.* at 1371. That is confirmed by the Coalition's own statements to

Commerce about the scope of their petition. Thus, the critical question is whether the imported items included, or were assembled with post-entry, a Chinese-origin frame or body that left China *with* an installed suspension *and* powertrain components installed or installation-ready—**[[ ]]** *See* C.R.14, CR001881 (**[[ ]]**). If it did not, then ICON's imports are not subject, even if Chinese parts are later imported to complete an LSPTV.

With that understanding of the scope, Customs' reasonable-suspicion determination falls apart. Start with ICON's imports of parts. The Notice claims that there is reasonable suspicion of evasion because ICON shipped "separate chassis and other golf cart components[.]" Notice 14. Specifically, Customs believed "ICON's practice of importing **[[ ]]**" in shipments separate from those "described as containing **[[ ]]**, without certifications stating that they will not be assembled as golf carts," to be suspicious. *Id.* But as noted, the minimum requirement for a product to be subject to the *LSPTV Orders* is that it be a Chinese-origin rolling chassis, or that it be a particular part imported to be assembled with a Chinese-origin rolling chassis. Separate chassis *components* imported in separate shipments plainly do not meet the *LSPTV Orders*' scope, certification or not.

Plus, Commerce's certification requirement applies only to "entries made *on or after [its] publication*" on June 23, 2025. 90 Fed. Reg. at 26,538. The parts that Customs referenced as suspicious in the Notice, according to the initiation memorandum, "**[[ ]]**." C.R.9, CR000448. In other words, Customs found suspicious the lack of a certification that ICON was never required, nor (according to the record) asked by Customs, to provide.

And even if ICON's imports of parts were somehow suspicious (and they were not), those entries that Customs identified occurred early in 2025, before ICON had shifted its supply chain and began sourcing Vietnamese components, including frames. Yet the challenged interim measures required live entry, cash deposits, and entry rejection and refiling back to June 10, 2025, at the earliest—after ICON had started importing carts with Vietnamese frames. Thus, the evidence that Customs relied on to take the "nuclear" option of putting ICON out of business was too stale, at least as it related to the entries actually covered by the interim measures. *Cf. Sgro*, 287 U.S. at 210.

Then consider Customs' criticisms of the CF-28 responses, which, keeping the *LSPTV Orders*' scope in mind, also fail to demonstrate reasonable suspicion of evasion. The CF-28 response for Entries 2500 and 3011—the April and May 2025 entries of body kits—were supposedly deficient because there appeared to be some **[[** **]]** included in the bill of materials. Notice 11-12. But these responses included pictures of the body kits, which showed that the body kits lacked installed suspensions, as is required by the *LSPTV Orders* for a product to be considered a subject rolling chassis. C.R.11, CR000511-20. And again, the scope covers rolling chassis—a frame *with* an installed suspension *and* powertrain components installed or ready for installation. Thus, the presence of some minor suspension parts *still* would not make the body kits subject to the *LSPTV Orders* absent any powertrain components. And the imported body kits lack powertrain components—a fact Customs has never disputed. Additionally, even if all this somehow still added up to reasonable suspicion (and it does not), these April and May 2025 entries likewise reflect stale evidence of outdated builds of carts that would not justify the imposition of interim measures on ICON's more recent imports that would be covered by these measures.

The CF-28 response for Entry 3185, made on June 12, 2025, was fresher, but still provided no reasonable suspicion of evasion. Customs' claimed issue with the response was that "key components" like the **[[** **]]** were Chinese-origin, and that it was not clear whether **[[** **]]**. Notice 12-13 (also noting that certain Vietnamese suppliers did not "appear[] to provide" key "components necessary for golf cart assembly" and that it was "unclear whether" a **[[** **]]** of components had been implemented). Yet ICON's response made clear that the carts in question contained Chinese-origin frames along with other components of both Chinese and Vietnamese origin, all assembled in Vietnam. ICON further clarified that the Chinese-origin frames were **[[** **]]**. C.R.15, CR001897.

Customs further claimed that "production records [were] inadequate" because they "mainly" contained "general log entries" without "specifying methods or procedures[.]" Notice 12. Of course, according to the record, at no point prior to the Notice did Customs suggest to ICON that these production records were inadequate for these reasons. Regardless, the production records do in fact provide specific methods and procedures. A production flowchart specifies the exact methods and procedures used in Vietnam to produce LSPTVs using Chinese bare frames, including narrative descriptions and pictures of equipment used, from drilling the frame to installing suspension and powertrain components. C.R.11, CR000969-85. The "Assembly Department Daily Report," which Customs derides as "general log entries," tied specific production orders for the carts in the entries to the steps detailed in the production flowchart through shorthand descriptions like "[c]hassis [a]ssembly" and "[e]lectrical [c]omponents [i]nstallation." CR000890-905. That Customs refused to make, or was incapable of making, the

connection between these shorthand descriptions and the full methods and procedures listed in the production flowchart does not create reasonable suspicion. Nor can Customs generate its own reasonable suspicion by deeming documentation "inadequate" through *ipse dixit* or burying its head in the sand rather than asking the importer for clarification or supplementation.

Finally, the CF-28 issued to Marxon for Entry 6855, made on October 31, 2025, likewise provided no reasonable suspicion of evasion. To start, the Notice faulted ICON for not explaining in Marxon's CF-28 response why Marxon was its new importer of record—even though the CF-28 was not addressed to ICON and did not request that information, C.R.5, CR000220-2—then in a footnote provided the reason why Marxon was serving as ICON's importer of record which only ICON or Marxon could have known. Notice 13 & n.117. The failure of one party to provide information never requested from another party, which was then apparently later provided, cannot create reasonable suspicion of evasion.

Moreover, Customs again either refused to consider the evidence submitted with the CF-28 response or overlooked it. A "Frame Welding Daily Production Report," "Frame Welding and Polishing Daily Report," "Production Flow Chart," and "Frame Production Flow Chart" were included, among other documents. C.R.15, CR002120. The frame welding production reports detail (in Vietnamese) the employees who welded frames that were contained in the carts at issue, listing their names, ID numbers, stations, and work hours. CR002136-57. And the frame production flow chart (also in Vietnamese) provides a narrative and pictorial description of the machines and processes used to create frames in Vietnam from raw steel, including **[[**

**]]**. CR002244-53. This is also how the Coalition

describes the frame production process. C.R.4, CR000023-4. Given that the frames were made in Vietnam, Customs' criticism of the CF-28 response for "not specify[ing] how and from where the **[[ ]]** was sourced" or naming "suppliers or providing purchase records" makes little sense. Notice 13. Again, Customs cannot create its own reasonable suspicion by criticizing a CF-28 response for not containing information that it does, in fact, contain, or by asserting some document is "inadequate" in some way that is immaterial to the *LSPTV Orders*' scope. That is especially the case with respect to the Marxon CF-28 response because, by this time, Customs had received a **[[ ]]**—a fact that the Notice fails to mention.

And viewing all of Customs' nitpicking of the relevant CF-28s in its totality, there *still* would not be any reasonable suspicion. Imports of parts not subject to certification, imports of Chinese-origin products constituting something less than subject rolling chassis, and importing carts with Vietnamese frames through another importer of record when ICON's bond became saturated cannot support a determination of reasonable suspicion, even if some documentation did not meet Customs' standards of adequacy—especially when Customs never asked for additional information or clarification of the responses to remedy these purported deficiencies.

Furthermore, even if there were some reasonable suspicion of evasion at some point in time—which there was not—Customs lacked reasonable suspicion that the entries of carts to which the challenged interim measures apply contained covered merchandise. EAPA limits Customs' authority to impose interim measures to entries that contain "covered merchandise." 19 U.S.C. §1517(e)(3); *see id.* §1517(a)(3) (defining "covered merchandise" as "merchandise *that is subject* to" an antidumping or countervailing duty order (emphasis added)). EAPA does not permit Customs to expand the scope of Commerce's orders to cover imports of carts from third countries

not subject to those orders. Yet Customs' Notice imposed the interim measures at issue on all entries of carts from Vietnam, regardless of the *LSPTV Orders*' scope. For this to pass muster, Customs must have had reasonable suspicion that the affected entries contained Chinese-origin rolling chassis. But as discussed above, Customs did not. Whatever suspicion of evasion might have existed must have dissipated with regard to imports made at least by the time of the Marxon CF-28 response, through which proof of Vietnamese frame manufacturing was provided through extensive documentation and **[[ ]]**. That is, given ICON's consistent and transparent refrain that it was shifting its supply chain to Vietnam over the course of 2025, with increasing levels of Vietnamese content including Vietnamese-origin frames, there could not have been any reasonable suspicion of evasion of current imports sufficient to justify interim measures that largely required the immediate payment of millions of dollars on entries of carts with Vietnamese frames made from July 2025 onward, either by Marxon or ICON. EAPA's limitation of interim measures to entries containing covered merchandise required Customs to use a scalpel, not a sledgehammer, in reaching a reasonable-suspicion determination.

In sum, Customs lacked reasonable suspicion of evasion, in large part because of its misconstruction of the *LSPTV Orders*. And because Customs lacked such reasonable suspicion, the interim measures are unlawful. Alternatively, even if Customs *did* have reasonable suspicion of evasion as to some imports (and it did not), that suspicion was not fresh enough to justify imposing business-ending interim measures on later and current entries of carts that ICON and Marxon had demonstrated were not subject due to their Vietnamese-origin frames. Accordingly, ICON is entitled to judgment on Count Three of its complaint.

## V. The Court Should Issue Permanent Injunctive and Declaratory Relief

To remedy Customs' violations of law, the Court should permanently enjoin Customs from enforcing the interim measures during the pendency of the EAPA investigation and declare that Customs violated the law in imposing the interim measures. This Court has the authority to order any form of relief "that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. §2643(c)(1).

First, the Court should issue permanent injunctive relief prohibiting Customs from enforcing the interim measures. A permanent injunction may issue where a plaintiff has demonstrated "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). For much the same reasons that preliminary injunctive relief was warranted, a permanent injunction is also warranted. ICON will suffer irreparable harm absent injunctive relief, which cannot be remedied through later money damages. *See* Pl.'s Rule 56.3 Statement; *ICON I*, at 1372-73. And the balance of equities and public interest favor ICON, especially given that the limited scope of the injunction that ICON seeks and the important constitutional interests that the injunction would vindicate. *ICON I*, at 1373-74. Accordingly, a permanent injunction is the appropriate remedy for Customs' violations of law in imposing the challenged interim measures.

Second, the Court should issue a declaratory judgment, declaring that Customs violated the law when imposing the interim measures. A "declaratory judgment is a milder remedy which is

frequently available in situations where an injunction is unavailable or inappropriate." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1055 (CA1 1987). Here, there remains a live dispute between the parties, given that the interim measures would be enforced but for the preliminary injunction. Moreover, even if the EAPA investigation concludes by the time the Court enters its judgment, declaratory relief would still be warranted to vindicate constitutional rights, *see Steffel v. Thompson*, 415 U.S. 452, 466 (1974) ("Congress plainly intended declaratory relief … to be utilized to test the constitutionality of state criminal statutes in cases where injunctive relief would be unavailable[.]"), and at least as to Count Three, a resolution of which could impact further proceedings and the parties' rights.

## CONCLUSION

For these reasons, the Court should grant ICON's motion for judgment on the agency record, permanently enjoin Customs from enforcing those interim measures imposed under 19 U.S.C. §1517(e)(3) against ICON and Marxon, and declare that Customs' imposition of these interim measures was unlawful.

Dated: September 21, 2026

Respectfully submitted,

/s/ Luke Mathers
Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing submission complies with the word-limitation set forth in Standard Chambers Procedure 2(B)(1), and contains 13,955 words.

Dated: September 21, 2026

/s/ Luke Mathers
Luke Mathers